[Crim. No. 27715. Second Dist., Div. Five. Jan. 27, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT GAMBOA GUZMAN, Defendant and Appellant.

**COUNSEL**

Tekla Ann Palmer, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Defendant Robert Guzman and codefendant Monkhouse were each charged with one count of possession of heroin for sale (Health & Saf. Code, § 11351, count I) and one count of possession of heroin (§ 11350, count II). A jury acquitted Monkhouse on both counts and convicted defendant on count II. The trial court declared a mistrial and ordered defendant discharged as to count I. Defendant's motion for a new trial was denied. He was sentenced to prison and then placed on probation, on condition that he spend four days in jail and receive narcotics rehabilitation treatment from the Veterans' Administration for one year.

### FACTS

The only issue on appeal relates to the misconduct of one of the jurors during deliberations. For that reason neither side has found it necessary to summarize the evidence adduced at the trial, which covered about 550 pages of reporter's transcript. We gather, however, from the very brief preliminary hearing transcript, that the basic theory of the prosecution was that defendant, assisted by Monkhouse, was selling bags of heroin outside a Methadone center. As police officers were about to arrest both men, defendant threw away a bag containing six balloons of heroin. After defendant was arrested, $385 was found on his person.

### Jury Deliberations

A jury of 12 and 2 alternate jurors were impanelled. Jury deliberations began on Monday, June 9, when the jury deliberated for about 15 minutes. On Tuesday, June 10, the jury deliberated the entire day. On Wednesday, June 11, the jury deliberated for about an hour, and after requested testimony was reread, retired for about 90 minutes. On Thursday, June 12, the jury deliberated the entire day.

On Friday, June 13, the jury deliberated in the morning, and apparently reached a verdict on codefendant Monkhouse. Even before the verdict was read, juror Updyke had handed the court a note. It read: "The verdict is challenged by me at this point." The clerk then read the verdicts which found Monkhouse not guilty on both counts. In response to the question, "are these your verdicts . . . ," juror Updyke said: "No. At this point, under these conditions, it is not . . . . It's going to be challenged of the game [sic], the way it's been played. . . . I have to get that in at this point."

Immediately after these abortive proceedings, counsel for defendant requested that juror Updyke be examined. Exhibiting considerable acumen, counsel argued that "the only logical inference of [Updyke's] remarks here [is] that he is bartering his vote and not considering the guilt or innocence of the two defendants separately as he promised to do. . . ." The court denied the request.

At the jury's request, additional testimony was reread; this took up most of Friday. Sometime during that day, juror Lewis gave the bailiff a note. At about 4 p.m. the jury was excused except for juror Lewis. The court then said: "The juror, Mrs. Lewis, has sent the court a note stating: 'Your Honor, Mr. Updyke is, in my estimation, in contempt of court. He stated at 3:15 p.m., June 13, 1975, he discussed with five other jurors he changed his vote. I ask if I may be excused from this case.' "

On being questioned by the court, the reason that juror Lewis gave for wishing to be excused was because "personal feelings, Your Honor, are getting to the case." The court denied her request to be excused.

On Monday, June 16, the jury resumed deliberations, and, after more testimony was reread deliberated the rest of that day without reaching a verdict.

On Tuesday, June 17, the court informed the parties that the preceding afternoon it had received a note from juror Weaver stating that "one juror discussed 'bargaining' with five other jurors (without knowledge of the others) which resulted in a change of the previous decision." Defendant's attorney renewed a previously made request for a voir dire of juror Updyke and also moved for a mistrial, which motion the court took under submission.

The court then questioned juror Weaver, who testified that the "primary juror" involved in the bargaining was juror Updyke; that Updyke proposed "that he would only vote in one manner unless we voted a certain decision for another defendant;" that this occurred at about 3:15 p.m. on Friday and that Updyke had discussed this with five jurors, three of whom changed their votes; that Updyke repeated his statements or proposal on Monday morning in the presence of all of the jurors; that none of the jurors verbally agreed with Updyke's suggestions. The jurors who had changed their vote after hearing Updyke's proposal, were jurors Morning, Horlocher and Vandette.

The court then examined juror Updyke. He said, in substance, that on Friday morning in the presence of five of the jurors he told the jurors present that he would not vote to acquit Monkhouse unless the jury agreed to convict Guzman.[1] The court then questioned seven members of the jury.

(1) Juror Curley, the foreman, recalled the Friday morning incident; four or five jurors were present.[2] One or two of the jurors present, including juror Horlocher, concurred with Updyke. Curley told Updyke that he thought he ought to wait for the whole jury to arrive. It was his belief that during later deliberations on Friday, the jury as a whole opposed Updyke's bargain, but he was not sure whether "everyone did."

(2) Juror Morning recalled the Friday morning incident. His impression was that one or more of the jurors present were agreeable to Updyke's position. Updyke repeated his position Friday afternoon. However, there "wasn't any concurrence on anybody's part at that time. There was too much animosity flowing." He was not asked whether he changed his vote nor whether he was one of the jurors who had agreed with Updyke on Friday morning.

(3) Juror Reis remembered the Friday morning incident. On Friday afternoon everybody "started yelling at" juror Updyke. Juror Reis told Updyke "out of anger" that if Updyke would change his vote on one

---

[1] Juror Updyke's statements to the court were not nearly that clear and straightforward. At this point, however, no one disputes that, in substance, this is what he told some or all of his fellow jurors.

[2] Although one cannot be 100 percent certain, the five jurors to whom Updyke talked were the foreman Curley, and jurors Drake, Reis, Horlocher, Morning and possibly Vandette. Apparently the conversation took place as jurors were arriving to resume deliberations on Friday morning.

defendant to prevent a not guilty vote on another defendant, he, Reis, would change his own vote: "I just said, 'Hell, I'll vote guilty, then, just on principle,' you know, but I wasn't serious."

(4) Juror Horlocher did not remember much of what occurred Friday morning, because he was reading the newspaper; nor did he recall much of what occurred Friday afternoon. On Monday morning, Horlocher changed his mind but it had nothing to do with Updyke; he changed his mind "after hearing the testimony, and we took a new vote." Horlocher's recollection was that juror Updyke said that he had originally voted to find Monkhouse guilty and now Updyke felt he should have stuck to that vote.

(5) Juror Vandette did not recall that Updyke made a statement on Friday morning. She did recall that later Updyke said that he would join in an acquittal of Monkhouse, if defendant were found guilty. On Friday, nearly everyone that said anything was "definitely very set against" Updyke's proposal but on Monday when everyone was calmer, "many people started . . . trying to show him, . . . that he was going against the instructions . . . ." No juror was willing to go along with Updyke's proposal.

(6) Juror Drake remembered the Friday morning incident and recalled "someone saying [Updyke's suggestion] was a good idea, . . ." During a later recess jurors Morning and Horlocher said that they agreed with him. On Monday morning she thought that the same two jurors still agreed with Updyke's proposal. Monday morning, it was "the same old thing, everyone talking about it at the same time, trying to get their point across to him, that it was against the law."

(7) Juror Lewis did not hear Updyke make any statement Friday morning. She heard Updyke make the statement Friday afternoon. She could not recall anybody agreeing with Updyke's proposal.

The court did not examine the remaining jurors. Defense counsel agreed that Updyke "needs to be replaced," but renewed his motion for a mistrial, claiming the panel was contaminated. The court denied the motion, but discharged Updyke and replaced him with an alternate juror.[3]

---

[3]Updyke was discharged with the thanks of the court and a request that he "not converse with any person whatsoever for at least another week."

■ (See fn. 4.) Before permitting the reconstituted jury to retire, the court reinstructed it to the effect that the guilt or innocence of each defendant had to be decided separately, that it should analyze the evidence with respect to each defendant without considering evidence admitted solely against the other and that if the jury could not agree on the verdict as to one defendant, it should render "a verdict as to the one on which you agree."[4]

On that day, Tuesday, the jury deliberated for about two hours. On Wednesday, June 18, the jury deliberated the entire day. On Thursday, June 19, the jury resumed deliberations and, at about noon, returned with a guilty verdict against defendant on count I. Later the jury returned a not guilty verdict in favor of Monkhouse.

## DISCUSSION

■ Defendant contends, and the Attorney General concedes, that juror Updyke's conduct in proposing that the jury barter an acquittal of Monkhouse for a conviction of defendant constituted misconduct. Codefendants are not an "entry" in a horse race. An aggravating factor is that Updyke's proposal was broached during a "rump" session, at which only half the jury was present. Most vitally, as far as the integrity of the reconstituted jury that convicted defendant is concerned, there was substantial evidence from the foreman and particularly from juror Drake, that two jurors agreed with Updyke's approach. The issue on appeal is whether the court should have granted a mistrial.

We hold, contrary to defendant's basic contention, that sections 1089 and 1123 of the Penal Code do permit the substitution of an alternate juror when a regular juror is discharged for misconduct. Nevertheless, while we applaud the trial court's efforts to save this jury, it is our opinion that they came too late and were not sufficiently thorough to expose the potential effect of the misconduct. We therefore do not reach the question whether the record that was made supports a finding that the jury was not contaminated.

The trial court, in discharging juror Updyke and replacing him with an alternate, relied on Penal Code section 1123. Both Penal Code

---

[4]Understandably, lacking prescience of *People* v. *Collins* (1976) 17 Cal.3d 687, 694 [131 Cal.Rptr. 782, 552 P.2d 742], the court did not tell the reconstituted jury to "deliberate anew"—an instruction required when a member of the jury is discharged during deliberations and is replaced with an alternate.

sections 1089 and 1123 provide for the substitution of an alternate in certain situations. Defendant asserts that neither section permits a juror who is discharged for misconduct to be replaced by an alternate. Rather, defendant contends the only remedy for juror misconduct is a mistrial.

Section 1089 provides, as relevant: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause* shown to the court is found to be unable to perform his duty . . . , the court may order him to be discharged and draw the name of an alternate, . . ." (Italics added.)

Section 1123 provides, as relevant: "If before the jury has returned its verdict, . . . a juror becomes sick *or upon other good cause* shown to the court is found to be unable to perform his duty, the court may order him to be discharged. If any alternate jurors have been selected . . . one . . . shall then be designated . . . to take the place of the juror so discharged." (Italics added.)

Neither section 1089 nor section 1123 defines "good cause." ■ A general rule, with respect to discharging a juror and substituting an alternate, is as follows: "A juror's admission that by reason of the nature of the case it would be difficult for him to keep an open mind constitutes a basis for his disqualification upon a challenge for actual bias. [Citations.] In turn, belated discovery of such a ground for disqualification while the trial is in progress may amount to good cause for the court to order the juror's discharge, provided it actually renders him 'unable to perform his duty.' [Citations.]" (*People* v. *Compton* (1971) 6 Cal.3d 55, 59 [98 Cal.Rptr. 217, 490 P.2d 537].)

*Compton*—which involved a juror's asserted inability to keep an "open mind,"[5] does not necessarily apply where the cause for a juror's discharge is misconduct. However, in *People* v. *Hamilton* (1963) 60 Cal.2d 105, 127 [32 Cal.Rptr. 4, 383 P.2d 412], the court had said: "Section 1089 does not provide that misconduct of a juror shall be a ground for substituting an alternate. If the judge believed the juror had been guilty of misconduct, then he should have granted the motion for mistrial . . . . If he did not so believe, there was no room for a finding that she was unable to perform her duties. It follows that the substitution was not within the purview of the code section, and hence constituted error."

[5]The precise issue in *Compton* was whether the trial court properly declared a mistrial where an *alternate* juror expressed an inability to maintain an open mind. The court held there was no legal necessity for discharging the entire jury. (6 Cal.3d at pp. 60-61.)

Relying on the history of section 1089, the court thought that the term "other good cause" did not include misconduct.

*Hamilton* has not been applied, to our knowledge, in any other case, possibly because the problem which gave rise to the ruling has ceased to exist for some time. In *Hamilton* the alleged misconduct which led to replacing the juror with an alternate occurred during the penalty phase of a murder trial, but before the submission of the case to the jury. The alleged misconduct was that one juror had read the Penal Code, and had also disclosed her opposition to the death penalty. The court first held that "the mere reading of the Penal Code, for the sole purpose of becoming better informed, cannot, without more, be either misconduct or an act which results in inability to perform the duties of a juror." (*Id.,* at p. 126.) The court then went on to say, as quoted above, that section 1089 does not provide that misconduct is a ground for substituting an alternate juror. In explaining why such substitution was prejudicial error, the court pointed out that the prosecution had moved to discharge the regular juror on grounds that she had disclosed her opposition to a verdict imposing the death penalty, and that it would be prejudicial error to discharge a juror for such a reason because otherwise "the court could 'load' the jury one way or the other." (*Id.,* at p. 128.)

Since the court first found that there had been no misconduct and further pointed out that the true ground asserted by the Attorney General in seeking to have the juror removed was that juror's opposition to the death penalty, the statement that section 1089 does not provide for misconduct as a ground for substituting an alternate juror, was not necessary to the *Hamilton* decision. While we are as reluctant as any court to disagree with Supreme Court dicta, we are encouraged to do so by the holding in *People* v. *Collins, supra,* 17 Cal.3d 687, 692, where the court said: "Substitution of an alternate juror upon a showing of good cause is desirable to maintain judicial efficiency. By means of substitution retrial of lengthy cases may be avoided."

An iron-clad rule barring the replacement of a wayward juror with an available alternate could have a monstrous effect on judicial efficiency. Suppose a jury has been sequestered for several months. One evening, during the evidence phase of the trial, one of the jurors eludes his guardian bailiff.[6] Several hours later he is found treating an audience of

---

[6]It will be recalled that the alleged juror's misconduct in *Hamilton* occurred before the case was submitted to the jury. Since the *Hamilton* dictum is based on the court's interpretation of section 1089 of the Penal Code which permits substitution for "good cause" both "before or after the final submission of the case," it is clear that if misconduct automatically calls for a mistrial, it is immaterial when it occurs.

bar patrons to a blow-by-blow account of the trial and making book on its outcome. He is immediately detained, kept segregated from the other jurors and, when sufficiently sobered up, brought before the court and discharged. We find it impossible to believe that under such circumstances the trial court has no choice but to grant a mistrial, although alternates are available and the offending juror's well-encapsulated misconduct could not have had any effect on his fellow jurors.

■ We therefore hold that a juror's misconduct is "good cause" which, under the provisions of section 1089—as well as section 1123—may permit the court to replace him with an alternate. Whether or not that is what the court should do in a particular case, depends on whether the misconduct of the discharged juror has destroyed the integrity of the remaining jurors "in terms of objective facts or events surrounding the misconduct itself." (*People* v. *Brown* (1976) 61 Cal.App.3d 476, 482 [132 Cal.Rptr. 217].) That this is a process of the utmost sensitivity, with obvious constitutional overtones, is clear. (*Parker* v. *Gladden* (1966) 385 U.S. 363 [17 L.Ed.2d 420, 87 S.Ct. 468].) The task becomes particularly delicate when, as here, the misconduct occurred during the jury's deliberations and involved all the other jurors, even if only as spectators. We need only point to *People* v. *Collins, supra,* 17 Cal.3d 687, 694, and the elaborate safeguards decreed by the Supreme Court when an alternate juror is substituted after deliberations have started. *Collins* did not even involve misconduct, but only the professed inability of one juror "to cope with the experience of being a juror." (*Ibid.,* at p. 691.)

■ In this connection it is well to remember that jury misconduct "raises a presumption of prejudice" which the People must rebut. (*In re Winchester* (1960) 53 Cal.2d 528, 534-535 [2 Cal.Rptr. 296, 348 P.2d 904]; *People* v. *Adame* (1973) 36 Cal.App.3d 402, 405-406 [111 Cal.Rptr. 462].) The application of that rule to this case means that it was the People's burden to isolate and negative the intangible and subliminal ways in which Updyke's misconduct could have affected the integrity of further deliberations—perhaps an impossible task.[7]

---

[7]An additional problem which faces a trial court attempting to determine the effect of misconduct on jurors, is the type of evidence admissible on the issue. It is clear that if misconduct is brought to light after a verdict has been rendered, section 1150 of the Evidence Code bars evidence to show the effect of the misconduct "upon a juror either in influencing him to assent to or to dissent from the verdict or concerning the mental processes by which it was determined." While, literally read, section 1150 presupposes that a verdict has been rendered, an inquiry during deliberations may well come within its spirit. It is evident that in this case much evidence concerning the mental processes of

 Applying these guidelines and taking the record as a whole, we feel compelled to hold that the trial court erred in refusing to discharge the jury as repeatedly urged by defense counsel. We so hold conscious of the fact that while the determination of disputed "historical" facts is for the trial court, the ultimate issue of the fundamental fairness of the trial proceedings demands an independent review of the whole record by us. (*People* v. *Brown, supra,* 61 Cal.App.3d 476, 481-482.)

 First and foremost, that Updyke was a rogue juror was apparent even before the abortive verdict of Friday, June 13, acquitting Monkhouse. Instead of following defense counsel's suggestion that Updyke be immediately examined, the court permitted him to harangue and pollute his fellow jurors for two additional days of deliberations. Nor did the court examine Updyke after receiving Mrs. Lewis' Friday note that Updyke was "in contempt." Only after it received another note from juror Weaver on Monday, did the court finally question Updyke and eight jurors on Tuesday.

We think this delay doomed the Tuesday proceedings from the start. If "the sanctity of the deliberative process" demands an automatic reversal for the mere inadvertent, silent presence of an alternate during part of the deliberations (*People* v. *Adame, supra,* 36 Cal.App.3d 402, 405-409), surely the minimum response to Updyke's conduct on Friday was his immediate quarantine from the other jurors, followed by an appropriate investigation. The assessment of the potential for prejudice of juror misconduct is difficult enough. By delaying two full court days—plus an intervening weekend—the court increased not only the difficulty, but the potential itself.

The Tuesday hearing itself was inadequate. First: since it is uncontradicted that Updyke urged his illegal bargain on the entire jury for two whole days, we think that nothing less than an examination of all jurors was called for.[8] While the testimony of the jurors who were examined indicated pretty much that at least nine were, on the whole, unsympathetic with the proposed trade-off, the plain fact is that no one could testify exactly who said what and when.

the jurors whom the court examined was admitted. Since neither side objected, we need not determine the propriety of the questions. (See *People* v. *Reyes* (1974) 12 Cal.3d 486, 506, fn. 2 [116 Cal.Rptr. 217, 526 P.2d 225].)

[8]We note that the prosecutor did suggest questioning all the jurors. The court, however, refused "to call any more witnesses."

Second: While the foreman named Horlocher as a juror who agreed with Updyke—an impression later inferentially denied by Horlocher—Mrs. Drake did not identify juror Morning until after that juror had been examined by the court. During that examination he had not been asked about any commitment he may have made to Updyke. He should have been recalled.

In sum, the trial court neither minimized nor adequately explored the potential for prejudice triggered by Updyke's misconduct.

Finally, we note that if *People* v. *Collins, supra,* 17 Cal.3d 687, affects trials held before the date of that decision, there would be an additional basis for error. In *Collins,* the trial court's failure to instruct the "new jury" to "deliberate anew" was held to be harmless error because the case against the defendant was "very strong." As noted at the outset, the parties to this appeal have not summarized the evidence. For obvious reasons, we have not studied 550 pages of transcript to decide an issue we need not reach. Nevertheless, it seems fair to assume that had we done so, we would be unable to say that the *Collins* error was harmless. Even if we disregard the seven days of deliberation which preceded the replacement of Updyke, the reconstituted jury took another two days to reach a guilty verdict against defendant on one of the two counts on which he was charged.

The judgment is reversed.

Stephens, J., concurred.

**HASTINGS, J.,** Concurring and Dissenting.—I concur with that portion of the majority opinion that holds that a juror discharged for misconduct can be replaced by an alternate juror under the circumstances present in this case. However, if a juror's misconduct is such that it will prevent proper determination of the issues by the remaining jurors after he is removed, the court should not appoint an alternate. The damage has been done and a mistrial should immediately be declared. This is not such a case.

The trial court questioned the involved jurors and obviously concluded that Updyke's misconduct would not in any way affect the future decisions of the jury once he was replaced by an alternate. Any "presumption of prejudice" by the misconduct referred to by the

majority was properly overcome. This determination is, of course, a factual question for the trial court and should not be reversed by us unless there is no evidence to support it. In my view, there was ample evidence to support a finding whether specific or implied that the jurors could conscientiously continue their deliberations; therefore, I dissent with the majority opinion that a mistrial should have been declared.

After Updyke's removal, the court again instructed the reconstituted jury that it should consider the evidence with respect to each defendant separately. The jury then spent approximately two more days deliberating on the evidence against each defendant. Surely, this is a strong indication that they were acting conscientiously and free of any influence from Updyke. It must be remembered that the only misconduct charged to Updyke was that he wanted the jurors to consider the charges against the two defendants as a package. The record, I believe, overwhelmingly supports the conclusion that the jurors acted in accordance with the court's instructions.[1] There is no evidence that Updyke's misconduct, or the court's delay in discharging Updyke, carried over on other matters such as turning one juror against another, or wore down their determination so that they decided the case contrary to the instructions. Updyke's removal restored the jury to its proper position and permitted the jury to decide the guilt of defendant and Monkhouse separately and impartially.

In *Rogers* v. *County of Los Angeles,* 39 Cal.App.3d 857 [114 Cal.Rptr. 540], the court refused to grant a mistrial for a juror's misconduct. This court (Division 4) said at page 863: "The determination of a motion for a new trial rests so completely within the trial court's discretion that its decision on the matter will not be disturbed on appeal unless manifest and unmistakable abuse of discretion clearly appears."

There was no abuse of discretion here and I would affirm the conviction.

*People* v. *Collins,* 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742], was decided after this case and we do not know if the rule cited in the majority opinion will be retroactively applied. It did, however, hold that failure to instruct the jury to "deliberate anew" was harmless error in

---

[1]The other 11 jurors clearly understood the court's instruction on this point before Updyke was removed because they explained to him that he was wrong in his suggestion for this very reason. On questioning by the court, he admitted that he had misunderstood the instruction at first, but that other jurors had pointed this out to him.

view of the strong record. A review of the record here might justify a similar determination. However, since I am alone in voting to affirm such a review would be futile.