[No. D049444. Fourth Dist., Div. One. Apr. 6, 2007.]

GEORGE H. BERARDI, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

The Law Offices of Jose C. Rojo and Jose C. Rojo for Petitioner.

No appearance for Respondent.

Bonnie M. Dumanis, District Attorney, Jesus Rodriguez, Assistant District Attorney, Craig E. Fisher and Cathy Stephenson, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**HALLER, J.**—George H. Berardi filed a pretrial motion to dismiss a grand jury indictment charging him with murder and conspiracy to commit murder. The trial court denied the motion, and Berardi petitioned for writ of mandate, requesting that the trial court be ordered to grant his dismissal motion. He contends dismissal is required under Penal Code[1] section 939.71 because the prosecution failed to properly and fully notify the grand jury of the existence of exculpatory evidence. He also asserts dismissal is required on due process grounds, contending the prosecution engaged in continuous misconduct throughout the course of the proceedings against him.

In ruling on Berardi's dismissal motion, the trial court found the prosecution had not fully complied with its duty to disclose exculpatory evidence. However, the court declined to dismiss the indictment because it concluded there was no substantial prejudice to Berardi's rights. Berardi challenges this ruling, arguing he was not required to show prejudice. Alternatively, he contends prejudice should be evaluated under the harmless beyond a reasonable doubt standard and the record shows prejudice.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

We reject Berardi's argument he was not required to show prejudice. Section 939.71 expressly requires a showing of "substantial prejudice" to support a dismissal, and Berardi has presented no legal basis for deviating from this requirement. Further, we conclude "substantial prejudice" under section 939.71 should be evaluated based on the traditional test for state law error; i.e., whether it is reasonably probable the outcome would have been more favorable to the defendant absent the failure to disclose. When applying this test, the court should evaluate the record as a whole, taking into consideration such factors as the extent to which the lack of disclosure interfered with the grand jury's independence, and the strength and nature of the undisclosed exculpatory evidence as compared to the evidence supporting the grand jury's finding of probable cause to indict. If the accused shows it is reasonably probable that the grand jury would not have found probable cause to indict absent the disclosure error, the accused is entitled to dismissal of the indictment at the pretrial stage.

Berardi has shown the prosecution's disclosure to the grand jury was inadequate and inaccurate, and the disclosure deficiencies seriously interfered with the grand jury's investigatory function, undermining its independence. Examining the record as a whole, we conclude it is reasonably probable the grand jury would not have found probable cause to indict had it been properly informed of the exculpatory evidence. Accordingly, we grant Berardi's writ petition and order the trial court to dismiss the indictment under section 939.71. Given our holding, we need not address Berardi's request for dismissal on due process grounds.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Denial of Motion to Dismiss the Indictment*

About 6:00 p.m. on July 8, 2005, the authorities were summoned to a neighborhood to investigate a man lying on the ground. Marcus Keglar was found in a path between two apartment buildings on a cul-de-sac leading to a canyon area. He had been shot in the head. He was taken to the hospital, and thereafter died.

In August 2005, the police identified Daniel May as the person who shot Keglar. In a series of interviews, May admitted that he shot Keglar and stated that Berardi was not involved. Several months later, in March 2006, Anna Tong, a friend of May's and Berardi's, told the police that Berardi was involved in the planning of Keglar's murder. Based on the information received from

Tong, the district attorney's office filed a complaint charging Berardi with murder and conspiracy to commit murder. At a May 15, 2006 preliminary hearing, the court found probable cause to bind Berardi over for trial and an information was filed. On May 24, 2006, the cases against May and Berardi were consolidated for trial.

On June 13, 2006, Berardi filed a motion to dismiss the information based on prosecutorial misconduct. In support of this motion, Berardi claimed the prosecution had failed to disclose that it had discussed immunity with Tong, and it had failed to correct Tong's preliminary hearing testimony denying any immunity discussions.

While Berardi's motion to dismiss the information was pending, the prosecution sought a grand jury indictment against Berardi and May.[2] After the prosecution presented its evidence, the grand jury found probable cause to indict Berardi and May. The indictment was filed on July 12, 2006. Because of the indictment, the earlier filed information was apparently dismissed and the motion to dismiss the information became moot.

On August 14, 2006, Berardi filed a motion to dismiss the indictment under section 939.71. Berardi contended the prosecution failed to inform the grand jury of several items of exculpatory evidence and misrepresented exculpatory evidence. The judge ruling on this dismissal motion was the same judge who had sat as the magistrate for Berardi's preliminary hearing. The court ruled that the prosecution had failed to comply with its duty to notify the grand jury of exculpatory evidence, but that the deficiency did not create substantial prejudice. The court found that the record was "replete with evidence to suggest that . . . Berardi and . . . May committed the crimes . . . ," and concluded there would not have been a different outcome even if there had been full disclosure of the exculpatory evidence.[3]

---

[2] Berardi's motion to dismiss the information and the associated proceedings are not included in the record before us. From the parties' statements in the writ petition, it appears Berardi's motion to dismiss the information was brought under section 995 (alleging insufficient evidence of probable cause) and on nonstatutory grounds (alleging the failure to disclose the immunity meeting). According to the People's return, the section 995 portion of the motion to dismiss was denied in a pretrial ruling, and the nonstatutory portion of the motion was deferred for ruling by the trial court.

[3] At the inception of the hearing on Berardi's motion to dismiss the indictment, the trial court noted that it had presided over the preliminary hearing and thus it was familiar with the evidence pertinent to the probable cause issue. When ruling on the dismissal motion, the court considered what result the grand jury would have reached if it had been "given all the evidence that [the court] was given."

Berardi also moved to dismiss the indictment on due process grounds, contending the prosecution had engaged in continuing misconduct during the course of the case. The trial court rejected this argument. Accordingly, the trial court denied Berardi's motion to dismiss the indictment.[4]

Berardi filed a petition for writ of mandate with this court contending the indictment should be dismissed. We issued an order to show cause and stayed the proceedings before the trial court pending resolution of these writ proceedings.

## II. *Evidence Presented at the Grand Jury Proceedings*

At the inception of the grand jury proceedings, and before any evidence was presented, a deputy district attorney informed the grand jury how the proceedings would be conducted. The grand jury was advised that the prosecution would present evidence for the jury to consider in determining whether an indictment should issue and that the defense would not participate in the proceedings. The grand jury was also told that because neither defendants, nor their attorneys, were present, the prosecution was required to tell the jury about the existence of exculpatory evidence, and that it was the jury's obligation to decide whether it wanted this exculpatory evidence to be presented for its consideration.

Thereafter, the prosecution called six witnesses to present its case to the grand jury, and summarized several items of exculpatory evidence. The prosecution's witnesses were a paramedic who responded to the scene, a deputy medical examiner, an investigating detective (John Young), Tong, Tong's boyfriend (Nathanial Green), and a friend of the victim (Rochelle Wiggins). To review the writ petition before us, we shall set forth the testimony of the latter four witnesses and the prosecution's summation of exculpatory evidence.

### A. *Probable Cause Evidence*

*Detective Young's Grand Jury Testimony*

Detective Young briefly described the circumstances surrounding May's arrest and interviews by the police. Detective Young explained that May was identified as the shooter; that May had been recorded on a video camera at

---

[4] Berardi additionally moved to dismiss a lying-in-wait special-circumstance allegation that had been added to the charges, contending the allegation had been added for vindictive reasons. The court found there was no vindictive prosecution. However, the trial court dismissed the special circumstance allegation without prejudice, finding it was not supported by probable cause.

the Greyhound station the night of the shooting; and that in August 2005 the police spoke with May in Las Vegas and later extradited him to San Diego.

*Tong's Grand Jury Testimony*

Tong testified at length before the grand jury. She explained that May and Berardi were close friends and that during the week prior to the shooting they had been staying at her apartment. On the day of the shooting, Tong, Berardi, May, Tong's boyfriend (Green), and another friend (Bart Cameron) were at Tong's apartment. At Berardi's invitation, Tong left the apartment and went to a 7-Eleven store and Round Table Pizza with Berardi. During the course of their time together that day, Tong observed that Berardi received several calls on his cell phone from victim Keglar asking for marijuana, and she heard Berardi state he would deliver the drugs at a cul-de-sac location. While Tong and Berardi were at Round Table Pizza, Berardi told Tong that May was meeting with Keglar, and that May was going to shoot Keglar. According to Tong, Berardi indicated he wanted Keglar killed because Keglar was dating Berardi's ex-girlfriend (Desiree Winchell) and Winchell "wanted [Berardi and Keglar] to have a duel; and that one of them had to die in order to have her." Berardi told Tong that he was keeping his receipts from their visits to the 7-Eleven store and Round Table Pizza, and that Tong and a friend of his who worked at Round Table Pizza were his alibi.

Describing her reaction to Berardi's statements at Round Table Pizza about the anticipated shooting, Tong testified: "I was in a state of disbelief, like shock. I didn't really know how to react. I felt very . . . cut off from it, like it wasn't really happening. I kind of joked about it." Before leaving Round Table Pizza, Berardi received a cell phone call from May, and Tong heard Berardi say "the pizza has been delivered." Berardi also received a second call from May, and after this call Berardi told Tong that May had left the marijuana with the body and May had to go back to get it.

After leaving Round Table Pizza, Berardi and Tong returned to Tong's apartment. Shortly thereafter, the police arrived and asked to speak with them. They went outside to be interviewed. Keglar's girlfriend (Winchell) was also outside. May, who was inside the apartment, hid in a closet while the police were at the complex. Later, Berardi, Green, and May left the apartment together to take May to a Greyhound station. Before they left, May told Tong that he had shot Keglar.

In response to the prosecution's queries at the grand jury proceeding, Tong acknowledged that after she disclosed Berardi's involvement to the authorities, she requested immunity from any possible charges arising from the incident. Her request was denied. Tong also acknowledged that during her

initial interviews with the police she did not tell them about her conversation with Berardi at Round Table Pizza, nor did she tell them about May's statements to her. Tong stated she was afraid and did not want to get involved. Tong explained that it was not until several months later, in March 2006, that she provided them with the information. When asked why she changed her mind about disclosing what she knew, Tong stated that "it was sitting on [her] conscience"; it was affecting her relationship with her boyfriend, who continued to spend time with Berardi; and she had come to resent Berardi and could not be friends with him anymore knowing the situation. Tong stated she did not want her boyfriend to continue his friendship with Berardi because Berardi was a bad influence and she "just wanted [Berardi] out of our lives." Tong also stated that she was trying to protect May because she did not think he was a "hard, cold killer" and she thought by being quiet he might have a good case and be set free. Tong eventually told Green's father about her turmoil over what she knew. Green's father persuaded her to give him the detective's phone number to arrange another interview with the police.

### Green's Grand Jury Testimony

Tong's boyfriend, Green, testified before the grand jury that he had been friends with Berardi and May for about 10 years. Green apparently supplied marijuana to his friends so they could sell it. About a week before the shooting, Berardi had been receiving frequent phone calls from Keglar asking for marijuana. Berardi had previously told Green that Keglar had threatened Berardi's life because of the conflict over Winchell. Because of this, Green had refused to supply Berardi the drugs to transmit to Keglar.

On the day of the shooting, while May and Green were at Tong's apartment, Green supplied marijuana to May with the understanding that May would sell the drugs. Green did not know the drugs were for Keglar. May left the apartment for about 15 to 20 minutes, and when he returned Green heard him speak on the telephone, saying something about "the pizza being delivered." Later, when Berardi and Tong came back inside the apartment after talking to the police, Berardi stated, " '[May] sealed my fate,' " explaining that because Keglar had been threatening Berardi's life, Berardi would be the suspect and that Keglar's friends would kill Berardi.

### Wiggins's Grand Jury Testimony

Wiggins (victim Keglar's friend) testified that while Berardi and Winchell were still in a relationship, Winchell had started talking on the phone to Keglar, which angered Berardi. On July 8, 2005, Keglar told Wiggins he was going to buy some marijuana from Berardi. Wiggins expressed concern about

this because of Berardi's animosity towards Keglar, but Keglar stated the purchase was a good deal and would occur in broad daylight where no harm could occur.

## B. *Exculpatory Evidence Disclosed by the Prosecution*

After presenting its evidence to the grand jury, the prosecution reiterated its duty to disclose exculpatory evidence and the grand jury's power to order the production of evidence. The prosecutor stated: "Let me start off by starting with what I think is the most important instruction. . . . [¶] The prosecutor . . . has a duty to inform you, the grand jury, of the nature and existence of any exculpatory evidence that I'm aware of. . . . [¶] . . . [¶] . . . The grand jury is not required to hear evidence from the defendant, but you shall weigh all evidence submitted to the grand jury. And when you have reason to believe that other evidence within the grand jury's reach will explain away the charge, you can order the evidence be produced, and for that purpose may require the district attorney to issue process for the witness."

To comply with this disclosure duty, the prosecutor summarized statements codefendant May made to the police in a series of interviews. The prosecutor told the grand jury: "May admitted shooting Marcus Keglar. May told police he fired with his right hand. May said there was an agreement over the phone and other parties were involved, but the other parties did not feel safe and did not want to get involved in it. May was not entirely clear about what their reasons were, but May was asked to go do it. May was not entirely clear to the police on whom he was going to meet. [¶] May would not tell police who asked him to do the deal. May said it was his idea to meet at the end of the cul-de-sac. When Marcus arrived, May recognized his voice. They discussed the marijuana deal. May told Marcus that they had to move to a different area. Marcus was fidgety and kept going into his pocket. May thought Marcus was making awkward motions, stroking his chin with his left-hand and putting the marijuana in the other hand. When Marcus started going toward his pocket, he avoided eye contact. This prompted May to pull out the gun and raise it while Marcus was looking down at the marijuana. May shot him once in the forehead. After the shooting, Marcus collapsed straight to the ground. May ran away, then returned later to retrieve the marijuana."

As worded, the prosecutor's summary could be viewed as suggesting that May had told the police that he had agreed in advance with others (whom he refused to identify) to murder Keglar.

The prosecutor also summarized Berardi's various statements to the police during the investigation, and told the jurors that Berardi went to Las Vegas with the stated purpose of helping the police by contacting May. The

prosecutor also notified the grand jurors that Berardi had shown the police an e-mail from May in which May apologized to Berardi for getting him involved. Additionally, the prosecutor disclosed that at the time of the shooting a neighbor saw a suspicious-acting man at the scene, and during a photographic lineup, this witness stated May was not the suspicious-acting man.

## III. *Exculpatory Evidence Not Disclosed to the Grand Jury*

Berardi contends the prosecution was derelict in its duty because it inaccurately summarized May's statements to the police in a manner detrimental to the defense and failed to inform the grand jury that May had told the police Berardi was not involved in the shooting. Further, Berardi contends the prosecution should have informed the jury about (1) details of Tong's initial statements to the police that contradicted her later statements to the police and at the grand jury proceedings, (2) preliminary hearing testimony of Ahmed Omar that Tong told him she was going to lie about Berardi's involvement, and (3) preliminary hearing testimony of Round Table Pizza employee Matthew Ahmu that Tong did not appear upset at Round Table Pizza. We summarize each of these omitted evidentiary items.

### May's Undisclosed Statements to the Police

The grand jury was not aware that a complete reading of the lengthy police report summarizing May's statements suggests that the agreement over the phone involving other parties referred to a marijuana deal, not a murder agreement. Further, the grand jury was not told that May indicated he shot Keglar during the marijuana deal in self-defense because he became afraid that Keglar was going to attack him. Also, the prosecution failed to mention that May made clear he was the only person responsible for the shooting.

The relevant portions of the police report set forth May's statements as follows: "[T]here was an agreement made over the telephone. There were other parties involved but they, either did not feel safe or did not want to get involved in it. I am not entirely clear about what their reasons were but I was asked to go do it. I was not entirely clear on whom I was going to meet. [¶] No I did not talk to Marcus, myself, over the telephone. I was asked to meet and do the deal but I don't want to tell you by whom. It was my decision to meet at the end of the cul-de-sac. . . . [¶] . . . [¶] When [Keglar] walked up to me, he had both of his hands in his front pockets. At the time I really didn't think anything unusual about that. *It was his following actions that made me believe I was in danger.* [¶] The reason we walked down the sidewalk to do the deal was because of children playing in the area. I just didn't want to have them around when we were doing that. . . . [¶] . . . [¶] Most of the conversation . . . was of the type of conversation you would expect over

doing a drug deal. [¶] . . . [¶] *I felt uneasy when he first walked up but it didn't really start going south until he went quiet.* He was being fidgety. He kept going into his pocket and then he would rub his chin. He was kind of swaying from foot to foot. [¶] . . . . *Those were the actions that basically preceded my reaction to it (shooting).* [¶] . . . [¶] I reacted the way I did when his hand started going toward his pocket and then he'd kind of look up and then back down. He was basically averting eye contact with me. [¶] I don't specifically recall when I put my hand in my pocket for the gun. It was right around then. I remember my heart rate doubled as I was going through this action. . . . [¶] . . . [¶] . . . It was just something about his eyes that I thought he was contemplating something. . . ." (Italics added.)

May further told the police that he fled the scene after the shooting, but returned to retrieve the marijuana package because he realized other people's fingerprints might be on it and he "did not want to f____ anybody else over for what [he] did." May asked the police if a weapon had been found on Keglar, and when he was told none was found, May "immediately broke down and began crying," stating that he " 'screwed up.' " May stated that the fact that Keglar did not have a gun "meant there was no reason, none (meaning to shoot him)."

The grand jury was not aware that the police report indicates that May had made a statement expressly exonerating Berardi. The police report states that May said: "I am the only one responsible for shooting Marcus. [Berardi, Green, and Cameron] had nothing to do with it."

*Tong's Undisclosed Prior Inconsistent Statements*

Before Tong disclosed Berardi's admission at Round Table Pizza to the police in March 2006, she had been interviewed by the police on July 9 and 20, 2005. The grand jury was not apprised of the statements she made during these initial interviews that contradicted her later testimony to the police and her testimony at the grand jury proceedings. During the July 9 interview, Tong stated that Berardi did not sell marijuana, and she heard Berardi tell Keglar to "leave him alone and he didn't sell weed." During the July 20 interview, Tong told the police that "no one told [her May] killed [Keglar]," although she thought the circumstances appeared suspicious.[5]

---

[5] Tong's statement about suspicious circumstances apparently referred to her disclosure to the police at the July 20 interview that Berardi had told her that Keglar had threatened Berardi's life, that Keglar's friends had tried to kill May during a marijuana sale, and that Berardi and May had acquired a weapon for their protection.

*Omar's Undisclosed Statements About Tong's Plans to Lie*

At Berardi's preliminary hearing, Omar testified regarding statements made by Tong indicating her intent to lie about Berardi's culpability. This information was not presented to the grand jury. When called as a witness at the preliminary hearing, Omar testified that he was friends with Tong, and that on several occasions during January to March 2006 Tong told Omar that she was going to tell the police that Berardi was involved in May's killing and that Berardi had "arranged everything." According to Omar, Tong thought Berardi had something to do with the incident, but she did not have proof. Omar testified that Tong "straight-out just told [him] she was going to lie" and make up anything that would blame Berardi for the killing because she wanted Berardi to stay away from her boyfriend. When Omar asked Tong if she knew anything about the killing, she responded: " 'I don't really care what happened. I just want to get him away from my boyfriend.' " Omar testified he argued heatedly with Tong about this, telling her it was wrong, and eventually ended their friendship because of her plans. According to Omar, Tong never told him that Berardi admitted his involvement ·in the killing when she and Berardi were at Round Table Pizza.

*Ahmu's Undisclosed Statements about Tong's Demeanor at Round Table Pizza*

The grand jury was not informed about the observations of Berardi's friend, Ahmu, regarding Tong's demeanor at Round Table Pizza. Ahmu testified at the preliminary hearing that he was working at Round Table Pizza on July 8, 2005, and observed Berardi and Tong together. Tong appeared happy the entire time she was there and never appeared emotionally upset. When Berardi and Tong left the restaurant, Berardi shook Ahmu's hand, and Tong "was happy, just like she came in."

## DISCUSSION

In support of his challenge to the trial court's ruling that he suffered no substantial prejudice, Berardi asserts: (1) he was not required to show prejudice in a pretrial motion to dismiss the indictment; (2) if a prejudice showing was required, the harmless beyond a reasonable doubt standard applies; and (3) the record shows his rights were substantially prejudiced. To place these arguments in context, we first briefly summarize the law governing the prosecution's duty to disclose exculpatory evidence to the grand jury.

### I. *Overview of Prosecution's Duty to Disclose Exculpatory Evidence*

 A grand jury operates as part of the .charging process of criminal procedure, and its function is viewed as investigatory, not adjudicatory, in

nature. (*People v. Brown* (1999) 75 Cal.App.4th 916, 931–932 [89 Cal.Rptr.2d 589].) In performing its investigatory function, the grand jury decides if a crime has been committed and whether there is probable cause to indict the accused. (*Id.* at p. 931; *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026 [13 Cal.Rptr.2d 551, 839 P.2d 1059].) Probable cause exists if there is a " ' "strong suspicion" ' " of guilt. (*Cummiskey*, at p. 1029, italics omitted.) The grand jury conducts its investigation in secret, without notice to or participation by the defendant. (*People v. Superior Court* (*Mouchaourab*) (2000) 78 Cal.App.4th 403, 414–415 [92 Cal.Rptr.2d 829] (*Mouchaourab*).) The district attorney may appear before the grand jury to give information or advice or to question witnesses. (*Ibid.*)

Although the prosecution participates in the grand jury proceedings, it is essential to the proper functioning of the grand jury system that the grand jury operate independently of the prosecution. (*People v. Backus* (1979) 23 Cal.3d 360, 392–393 [152 Cal.Rptr. 710, 590 P.2d 837].) The grand jury is viewed " 'as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor' " and its mission " 'is to clear the innocent, no less than to bring to trial those who may be guilty.' " (*Johnson v. Superior Court* (1975) 15 Cal.3d 248, 253–254 [124 Cal.Rptr. 32, 539 P.2d 792] (*Johnson*).)

To fulfill its protective role, the grand jury is authorized to order the production of exculpatory evidence "to the end that the citizen may be protected from the trouble, expense, and disgrace of being arraigned and tried in public on a criminal charge for which there is no sufficient cause." (*Johnson, supra*, 15 Cal.3d at pp. 253–254.) This authorization is codified in section 939.7. Section 939.7 provides that although the grand jury is not required to hear evidence in favor of the defendant, if it has reason to believe there is evidence that will "explain away the charge" it should order production of the evidence.[6]

■ In *Johnson* the California Supreme Court addressed the issue of how the grand jury was to acquire the information necessary to comply with its section 939.7 obligation to consider evidence that would "explain away the charge." The *Johnson* court concluded that because grand jury proceedings

---

[6] Section 939.7 states: "The grand jury is not required to hear evidence for the defendant, but it shall weigh all the evidence submitted to it, and when it has reason to believe that other evidence within its reach will explain away the charge, it shall order the evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses."

are held in secret without notice to the defense, it was the prosecution that must inform the grand jury of the existence of exculpatory evidence, and that dismissal of the indictment was appropriate if the prosecution failed to do so. (*Johnson, supra,* 15 Cal.3d at pp. 254–255.) The Legislature later codified this disclosure rule in section 939.71. Section 939.71 provides that if the prosecution is aware of exculpatory evidence, it shall inform the grand jury of its nature and existence, and if the prosecution fails to comply with its disclosure duty and the failure "results in substantial prejudice," the portions of the indictment related to the undisclosed evidence should be dismissed.[7]

Taken together, sections 939.7 and 939.71 codify the interplay between the grand jury and the prosecution. Section 939.7 describes the grand jury's investigatory function, and section 939.71 affirmatively obligates the prosecution to facilitate the investigation. Because it is unlikely the grand jury will learn of exculpatory evidence if the prosecution does not bring the evidence to its attention (*Johnson, supra,* 15 Cal.3d at p. 255), the indictment is deemed invalid if the prosecution fails to comply with its statutory obligation and the omission causes "substantial prejudice."

## II. *Requirement and Meaning of Substantial Prejudice*

Berardi claims that he was not required to show prejudice, or, alternatively, that prejudice should be evaluated under the harmless beyond a reasonable doubt standard. These issues, pertaining to the existence of a prejudice requirement for a section 939.71 dismissal and the meaning of the term "substantial prejudice" used in that section, present questions of law that we review de novo.[8] (*People v. Cromer* (2001) 24 Cal.4th 889, 894 [103 Cal.Rptr.2d 23, 15 P.3d 243].)

### A. *Prejudice Requirement*

Berardi argues that he is entitled to a pretrial section 939.71 dismissal even without a showing that the prosecution's failure to disclose exculpatory evidence prejudiced him. In support of this argument, he cites dicta in a case

---

[7] Section 939.71 states: "(a) If the prosecutor is aware of exculpatory evidence, the prosecutor shall inform the grand jury of its nature and existence. Once the prosecutor has informed the grand jury of exculpatory evidence pursuant to this section, the prosecutor shall inform the grand jury of its duties under Section 939.7. If a failure to comply with the provisions of this section results in substantial prejudice, it shall be grounds for dismissal of the portion of the indictment related to that evidence. [¶] (b) It is the intent of the Legislature by enacting this section to codify the holding in Johnson v. Superior Court, 15 Cal.3d 248, and to affirm the duties of the grand jury pursuant to Section 939.7."

[8] Berardi did not raise these two arguments before the trial court. Because they involve pure questions of law, we will consider them.

that predates the 1997 enactment of section 939.71 (*People v. Laney* (1981) 115 Cal.App.3d 508, 513 [171 Cal.Rptr. 493]), and a case that involves a motion to dismiss an indictment that was not based on section 939.71 (*Dustin v. Superior Court* (2002) 99 Cal.App.4th 1311, 1325–1326 [122 Cal.Rptr.2d 176] (*Dustin*) [no prejudice showing required for error arising from failure to record and transcribe nontestimonial portion of grand jury proceedings in death penalty case]). His assertion is not persuasive.

Berardi's motion for dismissal based on the failure to inform the grand jury of exculpatory evidence is derived from the statutory right set forth in section 939.7 and defined by the California Supreme Court in *Johnson*, and later embodied by the Legislature in section 939.71. (See *Cummiskey v. Superior Court, supra*, 3 Cal.4th at p. 1033, fn. 3.) Section 939.71 expressly requires a showing of "substantial prejudice" to support a dismissal of the indictment. Further, even if the failure to disclose exculpatory evidence may in some instances rise to the level of a due process violation under the state Constitution (see *People v. Thorbourn* (2004) 121 Cal.App.4th 1083, 1089 [18 Cal.Rptr.3d 77]), there is no per se reversal rule broadly applicable to all constitutional error (see *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 530 [165 Cal.Rptr. 851, 612 P.2d 941]; *In re Wright* (2005) 128 Cal.App.4th 663, 673–674 [27 Cal.Rptr.3d 281]).[9]

In enacting section 939.71, the Legislature did not promulgate a policy-based rule requiring dismissal whenever the prosecution has failed to disclose exculpatory information to the grand jury. Instead, it explicitly set forth a prejudice requirement before mandating dismissal. Although California courts, in some instances, have fashioned a rule allowing for pretrial dismissal of an indictment or information without a showing of prejudice (see *Dustin, supra*, 99 Cal.App.4th at pp. 1325–1326), application of this approach here would be inconsistent with the Legislature's specific directive. Berardi has presented no legal basis to support deviation from the prejudice requirement expressly set forth in the statute.

### B. *Meaning of "Substantial Prejudice"*

■ Although the Legislature has clearly set forth a "substantial prejudice" requirement for a section 939.71 dismissal, it has not defined the meaning of

---

[9] The United States Supreme Court has determined that a prosecutor has no duty under the federal Constitution to disclose exculpatory evidence to a grand jury. (*United States v. Williams* (1992) 504 U.S. 36, 51 [118 L.Ed.2d 352, 112 S.Ct. 1735].) Thus, the duty in California is derived from state law.

that term, nor have we found any California case interpreting it. As we shall explain, we conclude the traditional "reasonably probable" test used for state law error applies to evaluate prejudice under section 939.71.

The test for assessing prejudice under state law is whether there has been a " 'miscarriage of justice,' " which is typically determined by evaluating the entire record to determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People v. Cahill* (1993) 5 Cal.4th 478, 492 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) The stricter harmless beyond a reasonable doubt test urged by Berardi is applied to federal constitutional error (*People v. Mower* (2002) 28 Cal.4th 457, 484 [122 Cal.Rptr.2d 326, 49 P.3d 1067]), which is not implicated here (*United States v. Williams, supra,* 504 U.S. at p. 51; *People v. Thorbourn, supra,* 121 Cal.App.4th at p. 1089 [no federal constitutional right to disclosure of exculpatory evidence by prosecutor at grand jury proceedings]). Because the right to disclosure of exculpatory evidence at grand jury proceedings is derived from state law, there is no basis to apply the stricter federal constitutional standard for prejudice.

We recognize that in some instances the courts have imposed a prejudice standard that is less stringent than the reasonably probable standard when relief is sought pretrial rather than after conviction. For example, in *People v. Standish* (2006) 38 Cal.4th 858, 882–883 [43 Cal.Rptr.3d 785, 135 P.3d 32], the court stated that a defendant bringing a pretrial challenge to an information on the basis that he or she was not " 'legally committed' " by a magistrate, need only show that the error " 'reasonably *might* have affected the outcome' " and need not show "it is reasonably *probable* he or she would not have been held to answer in the absence of the error." (See also *People v. Vasquez* (2006) 39 Cal.4th 47, 68–69 [45 Cal.Rptr.3d 372, 137 P.3d 199].) Although, like *Standish*, this case involves a pretrial challenge, the Legislature has defined the requisite prejudice for a section 939.71 dismissal as "*substantial.*" (Italics added.) The term "substantial" connotes something that is "considerable in quantity" or "significantly great." (Webster's 10th Collegiate Dict. (2002) p. 1170.) The traditional "reasonably probable" standard—which is derived from the miscarriage of justice requirement for reversal—conforms with this legislative directive that the prejudice be substantial. We conclude this is the appropriate test.

Courts in other jurisdictions evaluating error at grand jury proceedings have reached a similar conclusion. In *Lay v. State* (1994) 110 Nev. 1189 [886 P.2d 448, 454], the court applied a reasonable probability of a different outcome standard to evaluate the presentation of improper material at a grand

494

jury proceeding. Likewise, in *State v. Lucero* (1998) 126 N.M. 552 [972 P.2d 1143, 1148], the court stated that to obtain dismissal of an indictment for omission of exculpatory evidence the defendant must "present[] demonstrable prejudice by showing a substantial probability of a different outcome."

" '[A] reasonable probability of a more favorable result . . . exists [when there is] "such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result." ' " (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1432 [51 Cal.Rptr.3d 263].) In the context of grand jury proceedings, the court must decide whether the record reflects a probability that a properly informed grand jury would not have found probable cause to indict; i.e., whether the grand jury would not have found a strong suspicion of guilt. This analysis requires a consideration of the relative strengths and weaknesses of the evidence supporting the probable cause finding necessary to indict and the undisclosed exculpatory evidence. (See *id.* at p. 1432.)

In evaluating prejudice, one relevant consideration is the extent to which the prosecution's disclosure deficiency interfered with the grand jury's independent investigatory function. Because the grand jury is expected to act independently and prevent unwarranted prosecutions and yet must rely on the prosecution to present the evidence without participation by the defense, the prosecution is statutorily required to inform the grand jury of the existence of material exculpatory evidence. If the prosecution fails to comply with its disclosure duty and its failure undermines the grand jury's ability to perform an independent investigation, this may be a significant indication that the disclosure error affected the grand jury's finding. (See *Bank of Nova Scotia v. United States* (1988) 487 U.S. 250, 259 [101 L.Ed.2d 228, 108 S.Ct. 2369] ["infringement [of the grand jury's independence] may result in grave doubt as to a violation's effect on the grand jury's decision to indict"]; *People v. Backus, supra,* 23 Cal.3d at p. 393 [presentation of inadmissible evidence "may . . . compromise[] the independence of the grand jury and contribute[] to the decision to indict"]; *Mouchaourab, supra,* 78 Cal.App.4th at p. 435 [due process may be violated if grand jury proceedings "are conducted in such a way as to compromise the grand jury's ability to act independently and impartially in reaching its determination to indict based on probable cause"]; *Sheriff v. Frank* (1987) 103 Nev. 160 [734 P.2d 1241, 1245] [prosecution's omission of evidence and other misleading conduct " 'destroy[ed] the existence of an independent and informed grand jury' "]; *State v. Gaughran* (1992) 260 N.J. Super. 283 [615 A.2d 1293, 1297] [omission of exculpatory evidence may create "grave . . . doubt that the Grand Jury's determination was made fairly and impartially"].)

We note that not all cases involving some deficiency in disclosure and interference with the grand jury's independence will support dismissal. Rather, the court must evaluate the record as a whole, taking into consideration all relevant factors. These factors include the strength and nature of both the undisclosed exculpatory evidence and the probable cause evidence that was presented. Regarding the disclosure errors, pertinent inquiries include the extent of the impact on the grand jury's independence and the extent to which the material could "explain away the charge." If the record shows that sufficient evidence of probable cause remains even after considering the undisclosed evidence, this does not end the analysis. The court must still determine if there is " ' "such an equal balance of reasonable probabilities as to leave the court in serious doubt" ' " as to whether a properly informed jury would have declined to find probable cause to indict had it known of the omitted evidence. (*People v. Russell, supra,* 144 Cal.App.4th at p. 1432.) If so, the defendant has established the requisite substantial prejudice and is entitled to dismissal of the indictment.[10]

### III. *Evaluation of Substantial Prejudice Here*

Having defined the term "substantial prejudice," we next consider whether Berardi has carried his burden to show substantial prejudice from the disclosure deficiencies that occurred at the grand jury proceedings. The People assert that we should review the trial court's finding that there was no substantial prejudice under the abuse of discretion standard. We disagree, and conclude the de novo standard applies.

In this case, there is no factual dispute concerning the substance of the exculpatory evidence. Our obligation is to apply the undisputed facts to the controlling law and determine whether the prosecution's failure to disclose exculpatory evidence substantially prejudiced Berardi. This issue involves a mixed question of fact and law that concerns the fairness of the grand jury proceedings. Typically, appellate courts evaluate issues pertaining to fundamental fairness by deferring to the trial court's factual resolutions and then independently reviewing whether the rule of law as applied to the established facts was violated. (See, e.g., *People v. Ayala* (2000) 24 Cal.4th 243, 279 [99 Cal.Rptr.2d 532, 6 P.3d 193] [search and seizure]; *People v. Ault* (2004) 33 Cal.4th 1250, 1261–1262 [17 Cal.Rptr.3d 302, 95 P.3d 523] [denial of new trial motion for juror bias]; see also *People v. Guzman* (1977) 66 Cal.App.3d 549, 560 [136 Cal.Rptr. 163].) Additionally, irregularities at grand jury

---

[10] Our analysis concerns prejudice in the context of pretrial motions to dismiss under section 939.71 *followed by writ review.* If a defendant waits until after trial to challenge the denial of a pretrial dismissal motion on appeal, different considerations are operative. (See *People v. Pompa-Ortiz, supra,* 27 Cal.3d at p. 529; *People v. Laney, supra,* 115 Cal.App.3d at p. 513.)

proceedings should be closely scrutinized because protection of the defendant's rights is entirely under the control of the prosecution without participation by the defense. Accordingly, we will independently review the undisputed facts to determine whether Berardi's rights were substantially prejudiced.

Berardi complains about several evidentiary items that were not disclosed to the grand jury. Unquestionably, the most serious deficiency arises from the statements the prosecutor made to the grand jury when summarizing May's statements to the police. Although the prosecution included May's statements when it disclosed the existence of exculpatory evidence, it omitted May's statement that he was the only one responsible for the shooting and that *Berardi was not involved.* Additionally, the prosecution summarized May's statements to the police in a manner that could have easily left the impression that May had disclosed *an agreement to commit murder*, whereas when the police report is read in its entirety, May's actual statements to the police suggested *an agreement to sell marijuana* followed by a shooting that May asserted was in self-defense.

This inaccuracy is particularly significant because as worded by the prosecution, the summary of May's statements directly corroborated Tong's description of an agreement between May and Berardi to kill Keglar. Of all the evidence presented to the grand jury regarding Berardi's culpability, Tong's testimony was key. Tong provided the most critical testimony implicating Berardi in the murder, and without her testimony there would not have been sufficient evidence to indict. Further, Tong's credibility was at issue because of her belated disclosure about her knowledge of the murder. The prosecution's inaccurate summation of May's statements improperly bolstered Tong's credibility.

Additionally, the prosecution failed to inform the grand jury about Omar's testimony that Tong disclosed an intent to lie about Berardi's involvement. This was an additional item of evidence that was relevant to the credibility of the primary witness tying Berardi to the murder.

Thus, the record shows the prosecution significantly interfered with the grand jury's independence by misstating information in a manner that strengthened its case and omitting evidence that directly contradicted its key witness. The grand jury was deprived of the opportunity to exercise its discretion to consider important items of exculpatory evidence and likely concluded the prosecution's case was stronger than it was.[11]

---

[11] We recognize that if May would not testify at Berardi's trial, issues could arise regarding the admissibility of May's hearsay statements to the officer to the extent they are not inculpatory as to May. However, a trial court has wide discretion on this issue and could

Evaluating the record as a whole, the prosecution's case was predicated almost exclusively on the testimony of a single witness—Tong—whose information was derived from defendant's admissions, with no other direct evidence of guilt and no strong circumstantial evidence. Although the grand jury had the opportunity to assess Tong's credibility, it had no knowledge of three important evidentiary items that were relevant to that assessment: i.e., May's statement exonerating Berardi; May's statement that there was an agreement to sell marijuana, not an agreement to commit murder; and Omar's statement that Tong told him she was planning to lie to inculpate Berardi. These disclosure deficiencies, considered in the light of the probable cause evidence presented by the prosecution, create a serious doubt as to whether the grand jury would have found a strong suspicion of guilt absent the error.

We recognize that even if the grand jury had been notified of all the significant exculpatory evidence, it might still have credited Tong and found there was probable cause for an indictment. Further, there was sufficient evidence of probable cause based on Tong's testimony. However, as we stated earlier, the fact that the record can support a finding of probable cause does not mean there is no reasonable probability the jury would have rejected such a finding. The bolstering of the prosecution's evidence at the expense of the available defense evidence shows a reasonable probability that the jury would not have found probable cause had it been properly informed.

We are not persuaded by the People's assertion that there was no prejudice from the failure to disclose evidence at the grand jury proceedings because much of the complained-of omitted evidence was presented at the preliminary hearing where the magistrate found probable cause, and further the trial judge who ruled on the section 939.71 motion to dismiss also sat as the magistrate. As to the preliminary hearing, it is notable that the magistrate was *not* presented with May's exculpatory statements.[12] Thus, the magistrate's probable cause finding does not shed any light on whether the grand jury would have found probable cause even if properly informed about May's statements.

---

reasonably admit all or part of the statement. (See *People v. Lawley* (2002) 27 Cal.4th 102, 153–154, 155, fn. 21 [115 Cal.Rptr.2d 614, 38 P.3d 461].) Moreover, May could testify and there would be no hearsay issue. The People do not argue otherwise on this point.

[12] Because defense counsel did not present May's statements at the preliminary hearing, the People seek to diminish the weight of May's exculpatory statements to the police. May's statements constitute significant exculpatory evidence, and defense counsel's failure to present this information at the preliminary hearing does not alter the character of the evidence nor excuse the prosecution from complying with its duty to properly inform the grand jurors of its existence.

■ At Berardi's motion to dismiss the indictment, the trial court was provided with a copy of the police report containing May's statements, and thus was aware of their full content. Because the trial court sat as the magistrate at the preliminary hearing, the trial court's assessment of the evidence can certainly be considered when determining the effect of the error on the grand jury; however, the court's assessment is not determinative on the issue. The grand jury, like the magistrate, is called upon to make credibility resolutions and weigh the evidence when determining probable cause. (*Johnson, supra*, 15 Cal.3d at pp. 252–253.) As noted, the evidence presented to show probable cause essentially rested on the credibility of witness Tong. Depending on credibility resolutions, reasonable minds can differ whether there is probable cause to bring Berardi to trial. Although the trial court may have considered the import of May's statements on the probable cause assessment, the grand jury has not. Because this case presents no significant evidence of guilt apart from Tong's testimony regarding Berardi's admissions, and because the prosecution's presentation of May's statements to the grand jury improperly strengthened rather than weakened the prosecution's case, we are not satisfied that the magistrate's and trial court's findings defeat the showing of a reasonable likelihood of a different outcome absent the error.

Given our holding that there was substantial prejudice from the prosecution's inaccurate disclosure and failure to disclose the above cited items of exculpatory evidence so as to require dismissal of the indictment, we need not evaluate the other evidentiary items Berardi contends should have been disclosed.[13] We also do not need to address Berardi's contention that dismissal is warranted on due process grounds based on his claim the prosecution engaged in continuing misconduct throughout the course of the case.

---

[13] We do note that the other evidentiary items that Berardi contends should have been disclosed to the jury—including the details of Tong's statements to the police during her initial interviews and Ahmu's description of Tong's demeanor at Round Table Pizza—would not alone have required dismissal of the indictment. From the prosecution's examination of Tong, the grand jury knew she revealed the information about Berardi's admissions at Round Table Pizza many months after the shooting, and that she did not tell the police about them during her earlier interviews. This disclosure provided the grand jury with the essential information about Tong's belated communication of inculpatory evidence necessary to evaluate her credibility. The inconsistent details provided by Tong in the earlier interviews (i.e., that Berardi told Keglar on his cell phone that he did not sell marijuana and that no one told Tong that May shot Keglar), as well as Ahmu's description of Tong's demeanor at Round Table Pizza, do not so significantly negate Berardi's guilt as to create a reasonable probability of a different outcome.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its September 8, 2006 order denying the motion to dismiss the indictment and enter an order dismissing the indictment. The stay issued by this court on October 17, 2006, is vacated.

Nares, Acting P. J., and McDonald, J., concurred.