Filed 4/25/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| MARK BRECEDA et al., | B244574 |
| Petitioners, | (Los Angeles County Super. Ct. No. BA382977) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |


ORIGINAL PROCEEDING; petition for writ of prohibition. Bob S. Bowers, Jr., Judge. Petition granted.

Falangetti & Weimartz and Anthony J. Falangetti for Petitioner Mark Breceda.

Byrne & Nixon and Daniel V. Nixon for Petitioner Abe De Dios.

Steven Graff Levine for Petitioner Manuel Garcia.

Law Offices of Matthew M. Horeczko and Matthew M. Horeczko for Petitioner Rosemary Ramirez.

No appearance for Respondent.

Jackie Lacey, District Attorney, Roberta Schwartz, Carolyn C. Asayama and Carolyn Nakaki, Deputy District Attorneys, for Real Party in Interest.

Petitioners Mark Breceda, Abe De Dios, Manuel Garcia and Rosemary Ramirez seek a writ of prohibition following the trial court's denial of their motion to dismiss an indictment on the ground that the district attorney's office failed to adduce potentially exculpatory evidence to the grand jury as is required by Penal Code section 939.71.[1] Petitioners contend that the indictment should therefore be dismissed. The People oppose the petition on several bases: (1) the legal issue is not ripe because the trial court did not make findings which could be the basis for a legal determination that section 939.71 applies; (2) the interoffice memorandum (which is one of two documents petitioners contend was exculpatory) was not exculpatory; (3) if the memorandum is deemed exculpatory, equivalent evidence was presented to the grand jury; (4) there has been no showing of substantial prejudice from the nondisclosure; and (5) the trial court's interpretation of "prosecutor" under section 939.71, subdivision (a), to mean only the district attorneys presenting to the grand jury and not the entire office of the district attorney is correct for the purposes of grand jury proceedings.

We hold that because the office of the district attorney withheld exculpatory evidence from the grand jury, thus causing prejudice to petitioners, the five counts in the indictment that allege that petitioners committed embezzlement must be vacated.[2]

## INTRODUCTION

This petition arises out of a criminal prosecution against officials of the City of Irwindale (hereinafter "Irwindale"). On December 8, 2011, the office of the district attorney convened the grand jury to seek an indictment to charge petitioners Breceda, De Dios, Ramirez, and later Garcia with embezzlement of Irwindale funds by participating in excessively costly junkets to New York City paid for by third parties who were ultimately reimbursed with city funds and by claiming reimbursement from Irwindale per diem payments ostensibly for expenses which the council members had not paid out of their own pockets.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

[2] We express no opinion as to count 6, which names petitioner Ramirez, only.

2

After the grand jury returned an indictment against all four petitioners,[3] petitioners moved to dismiss the indictment for the failure of the office of the district attorney to present certain exculpatory evidence to the grand jury. The motion was denied; this petition followed. We issued an order to show cause, the parties submitted briefs, and we heard oral argument.

We grant the petition and prohibit the prosecution of petitioners on counts 1, 2, 3, 4 and 5 of the December 12, 2011 indictment.

There is a legal difference between the ethical and potentially criminal violation of accepting and failing to report the gifts from third parties, on one hand, and the criminal act of embezzlement, on the other hand, which, as charged in this case, is a fraudulent and thus knowing appropriation of public funds for a use that is not within a defendant's due and lawful execution of his public office.

Before the grand jury, the office of the district attorney primarily focused on a theory of "double dipping," emphasizing the theory in the presentation of witnesses and documents, and largely—but not exclusively—devoting the opening statement and closing argument to that theory. The prosecution also argued and adduced evidence that petitioners Breceda, De Dios, Garcia and Ramirez enjoyed excessively expensive hotels, meals, and entertainment while on Irwindale business in New York City; further, the district attorney's office provided evidence that third-party financial consultants paid for these lavish junkets. Yet, we do not fail to recognize that the petitioners herein are not accused of violating the Fair Political Practices Act for taking gifts from third-party consultants and failing to report the gifts. Instead, they are accused of embezzlement, taking public funds for their private benefit, that is—for a use that is not within a defendant's due and lawful execution of his or her office.

Therein lies the crux of our analysis as to whether the district attorney's failure to present certain potentially exculpatory items of evidence to the grand jury was unduly

---

[3] When the proceedings commenced, Garcia was a witness and had not been accused.

prejudicial to the petitioners. While the prosecution's presentation to the grand jury provided some evidence that city funds were used to reimburse the third-party financial consultants who hosted those trips, the evidence before the grand jury that Breceda, Garcia and Ramirez knew of such reimbursements, and thus arguably had a fraudulent intent to deceive, was scarce, if not absent.

While one trip may have cost the city over $62,000, the prosecution focused on the requests of three petitioners for a $75 daily allotment for meal expenses and the fourth petitioner's approval of these allotments. Apparently, unable to provide documentation and testimony that Breceda, Garcia and Ramirez knew that public funds were being used to send them off to Broadway shows and steak dinners, the prosecution focused on the council members' per diem allotments. We cannot ignore the likelihood that the grand jury, hearing over and over again that three petitioners improperly obtained daily allotments of $75 (and that one petitioner authorized payment of these allotments) would infer that one who is dishonest about a small sum of money (the allotments) necessarily had a fraudulent intent to embezzle public funds when they accepted lavish benefits (large sums) from a third party. Without that "double dipping" hook, the district attorney's presentation to the grand jury on whether the petitioners knew the benefits they received in New York would be paid for with public funds was remarkably weak.

Although the prosecution provided a somewhat different picture of De Dios, with evidence that third-party invoices for trip expenses were addressed to De Dios and that he authorized the release of city funds to pay those invoices, the prosecution's main focus was to adduce testimony to taint him with the double-dipping "chum"—despite the prosecution's acknowledgement that De Dios did nothing to connect him with double dipping, except cut the per diem checks to the other three petitioners.

That is why we conclude that all petitioners were substantially prejudiced by the failure of the prosecution to provide two significant documents that arguably demonstrate that the petitioners acted in compliance with city policy when they sought the $75 per diem payments.

4

## BACKGROUND

The facts are undisputed that, as Irwindale officials, petitioners traveled to New York City, annually from 2001 through 2005, to meet with bond raters for the purpose of raising the bond rating of the Irwindale. The indictment and presentation before the grand jury focused exclusively on expenses incurred in that time frame.

The subject indictment charges petitioners with five counts of embezzlement in their capacities as Irwindale officials. Petitioners moved to dismiss the indictment on various grounds, including the contention they raise here, that the prosecution violated its obligation to provide exculpatory evidence, and the omission was so prejudicial as to necessitate dismissal of the charges. The prosecution set forth evidence that petitioners went on several expensive junkets for which third-party financial consultants paid and were later reimbursed by Irwindale. The prosecution also adduced evidence that Irwindale provided Breceda, Garcia, and Ramirez with "$75 per diems," meal allotments for travel; that Breceda, Garcia and Ramirez retained the allotments up to $75 for each travel day, even when they did not pay for the meals out of pocket; and that De Dios authorized payment of the allotments. The prosecution adduced testimony that the allotments were contrary to city policy and were, at best, improperly allowed to occur with the consent of the city managers. Witnesses testified that neither the allotments nor the benefit of the junkets paid by third parties were reported to the Fair Political Practices Commission.

The grand jury indicted the petitioners for embezzlement, that is, fraudulently appropriating public property. Petitioners were not charged with violation of any of the statutes related to reporting to the Fair Political Practices Commission.

Petitioners moved to dismiss the five counts of the indictment on the basis that the prosecution's theory rested solely on double dipping, the misuse of the $75 allotment when petitioners had not paid for their own meals. Petitioners contended that the prosecution violated its statutory duty to present the grand jury with exculpatory evidence. This evidence consists of two Irwindale documents, a 2002 resolution and a 2002 city manager memorandum, which appear to state a policy or—at least—a practice

5

that each Irwindale official is entitled to a daily $75 allotment while traveling on city business, even if that official's meals were paid for by a third party.

In opposition, the deputy district attorneys who appeared before the grand jury presented their declarations stating that they had no personal knowledge of the 2002 city manager's memorandum and the prosecution was not limited to the double dipping theory. After much discussion as to whether the theory of double dipping was the sole basis for the prosecution and whether the prosecutors violated their statutory duty, respondent court denied the motion to dismiss. This petition followed.

Petitioners contend that the prosecution violated its statutory duty to ensure the independence of the grand jury by withholding exculpatory evidence. They assert that this omission was so prejudicial as to require the dismissal of the five counts against petitioners.

Resolution and memorandum

On March 28, 2002, the Irwindale City Council passed, approved and adopted Resolution, No. 2002-17-1808, which provides:

"WHEREAS, the City of Irwindale ('City') has adopted a travel and meeting expense policy providing procedures for the expenditure and accountability of the City's funds for travel and meetings related to the proper business of the City; and

"WHEREAS, the City's travel and meeting expense policy provides that the rate at which the reimbursable expenses of mileage and meals incurred for City business by its officers, employees, commissioners and members of the City Council shall be established by City resolution; and

"WHEREAS, the City has reviewed actual expenses incurred by Council and staff members at recent conferences and determined that the current $50 per day rate does not cover current reasonable per diem actual expenses, and should be increased.

"NOW, THEREFORE, the City Council of the City of Irwindale finds, determines and resolves as follows:

6

"1.  The mileage expense incurred by the officers, employees, commissioners and members of the City Council of the City for the proper business and benefit of the City shall be reimbursable by the City at the rate established by the Internal Revenue Service.

"2.  The per diem rate for meals shall be seventy-five dollars ($75.00) per day.

"3.  This resolution supersedes and replaces prior resolutions establishing the mileage reimbursement rate and per diem allowance."

The resolution was approved by Breceda, as mayor, and Garcia and Ramirez as members of the city council, along with council member Pat Miranda.

Via an interoffice memorandum dated July 25, 2002, City Manager Steve Blancarte[4] clarified the resolution, explaining that the per diem allowance was raised from $50 to $75, and adding, """"Note that this allotment is to be provided regardless of the inclusion of meals at the conference or workshop.  This interpretation is intended to partially offset the hardship incurred by those officials traveling overnight on city business.""""

At oral argument, Deputy District Attorney Carolyn Nakaki acknowledged that both the supervising attorney of the Fraud and Corruption Division and the investigator for that division knew of the 2002 resolution and the 2002 memorandum.  The investigator, Roberto Allas, referred to both documents in his affidavit in support of a 2008 search warrant of the office, vehicle, and American Express credit card records of John Charles Fitzgerald, one of Irwindale's financial advisors.

Grand jury proceedings

Deputy District Attorney Max Huntsman began the proceedings by stating that the petitioners took public money and spent it on themselves in "fancy meals and trips to New York that were really entertainment for them."  He did not refer to the petitioners as "targets" until he began to speak of their submission of reimbursement forms.[5]

---

[4] On July 14, 2011, Blancarte entered a plea of guilty to one count of violation of Penal Code section 424, a felony.

[5] Breceda and De Dios attended the June 2 to June 7, 2001 trip.  Breceda, De Dios, and Ramirez attended the July 27 to August 2, 2002 trip.  Breceda and De Dios

7

The first witness to testify before the grand jury was Robert Griego, Irwindale city manager from 1997 to 2000, who returned to that position "in 2004 or 2005." He testified that during his first tenure, city officials were required to submit receipts in order to be reimbursed for expenses. Reimbursement without receipts would have been against policy. When he returned to his position in Irwindale, he learned that the policy had been changed and that receipts were no longer required for reimbursement. Additionally, officials would be paid a set amount for daily expenses. Griego stated that he did not see the new policy documented in writing and characterized such a policy as "stealing." In 2005, he arranged for a change in policy.

Garcia, who was not yet a target of the investigation, testified that he has been serving on the Irwindale City Council since 2000. From April 13 through April 17, 2005, members of the city council traveled to New York City in an effort to improve the bond ratings for Irwindale. Garcia testified that he and the other officials stayed at the Ritz Carlton on Central Park, had meals together at various restaurants, including Peter Luger and La Bernardine, and attended the Broadway show, *Wicked.* He learned, "after the fact" from the "mainstream media" that Irwindale paid for all lodging, meals, and the tickets to the Broadway show. Under the impression that the financial advisor had paid all the expenses, Garcia formally requested reimbursement of $440, seeking $300 in meals and tips and $140 in miscellaneous expenses. He did not know that the financial advisor had not paid the expenses of the New York City trip, and that, in fact, Irwindale paid the expenses. He was never asked to reimburse Irwindale for any of the costs associated with the New York City trip. Garcia further testified that he was not aware that the average cost of lodging for each official was $733 per night; that the cost of transportation to and from the airport and meetings for each official was nearly $3,000; the average cost of each meal, per person, was $118.44; and the cost of entertainment was $120 per person.

participated in the November 8 to November 13, 2003 trip. Breceda, De Dios, and Garcia participated in the April 13 to April 17, 2005 trip. Breceda and De Dios attended the August 6 to August 11, 2005 trip.

Although Garcia believed that "someone other than the City of Irwindale" had paid all the expenses, he did not list the payment of expenses on his annual form to the Fair Political Practices Commission.

Julian Alvarez Miranda testified that he was a member of the Irwindale City Council from 1992 through 1997, from 2003 through 2007, and had just been re-elected. He testified that he refused to go to New York City to meet with bond raters because he "felt they were needless expenses." He never asked for reimbursement for meals for which he, himself, did not pay.

Miranda was asked to review documents pertaining to expenses for a 2001 bond rating trip to New York City. He testified that tickets for "Broadway plays or baseball games, [and] concerts . . . were needless expenses." He criticized expenditures for entertainment for the bond rating trips as unnecessary, even if business had been discussed at these events.

John Charles Fitzgerald, a municipal investment banker and financial advisor to municipal governments, testified that he has over 30 years' experience in the municipal bond field and that he concentrates on bonds for California cities, redevelopment agencies, school districts and special districts. From 2001 through 2005, he obtained financing for Irwindale through municipal bonds. Fitzgerald testified that it was common for members of city councils throughout California to travel to New York City to discuss bond ratings. Although he paid for all the expenses—including tickets to Broadway shows and sporting events—for each of the trips, he sought reimbursement from Irwindale pursuant to the California Fair Political Practice regulations.

Fitzgerald testified as to the 2001 trip that took place between June 2 and June 7: the attendees were petitioners Breceda and De Dios, as well as Pat Miranda, Joe Tapia, David Aleshire, and Blancarte and his wife Lucinda Blancarte. They stayed at the Hotel Carlyle, the expenses for which were billed through Fitzgerald to Irwindale. The entire party ate at Lespinasse the night of their arrival. Fitzgerald recounted the various meals, sporting event tickets, and Broadway show tickets that he paid for on behalf of Irwindale officials and which he in turn billed the city. Fitzgerald sent an invoice to Irwindale for

9

$48,173.63, including over $10,000 for town car services, $5,760 for theater and sporting event tickets, over $16,000 for hotel expenses, and $15,773 for other expenses, including meals. Fitzgerald testified that the city repaid him within 30 days of the date of his presentation of the bill. Fitzgerald testified similarly as to other bond rating trips, that is, his paying for the expenses as they were incurred with subsequent reimbursement by Irwindale.[6]

Fitzgerald further testified that he told City Manager Blancarte that his expenses had to be paid within 30 days of the date of his invoice. Fitzgerald testified that he recalled that Irwindale paid his expenses for the 2001 and 2005 bond rating trips. Fitzgerald testified that he submitted the reimbursement requests to De Dios and that Blancarte had instructed Fitzgerald "don't send all the details and the receipts and all that stuff. He said just summarize it in the categories like transportation, meals and that, and so that's how all my invoices were based upon a summary of the classifications." Fitzgerald went on to testify that he sent an invoice to De Dios for $38,959.79 for the 2002 trip, with a breakdown of costs. He testified that he "recall[ed]" that the invoice was paid within 30 days of presentation. He also answered in the affirmative when asked whether Irwindale paid for the 2005 trip. When asked whether De Dios requested that Fitzgerald forward details of the 2003 and 2005 trips to De Dios in 2007, Fitzgerald stated that he did not recall.

When Fitzgerald was asked, "Now, was there any formal language in the bond proposal agreements describing the reimbursement, how reimbursement would occur for your company having fronted the cost of the New York City trips?" Fitzgerald responded, "No." When asked a question posed by a juror, "Is it standard for a public agency client to pay for your expenses, hotel costs, meals, entertainment, travel, et cetera," Fitzgerald responded in the affirmative, "with the stipulation that the reimbursement be made . . . because they don't have a budgeted amount in their budget."

---

[6] Some warrants were made out to Wulff, Hansen (which handled payments to Fitzgerald).

Maxine Nunez, financial management assistant during the period of 2001 through 2005, testified that De Dios was her direct supervisor. She testified that at city council meetings, the voucher register for the trip expenses paid by Fitzgerald would be presented "under his company name" with a "single line item cost." The vouchers were not itemized into specific costs, but the council members were entitled to request details regarding the line items. Nunez testified that she remembered that only Julian Miranda questioned the amount, but did not recall which meeting in which year. She further testified that before each trip, each council member would be given an advance on the daily allocations of trip expenses, with any excess to be returned to the Finance Department. Without specifying a year, she stated that she was concerned that the council members were keeping the daily allocations even though Fitzgerald had paid for their meals. She testified that the city manager [Blancarte] told her that "it was an unusual circumstance" and the city manager "has the right to deviate" to allow "double dipping."

Deputy District Attorney Susan Schwartz questioned Nunez extensively about double dipping. Without specifying dates, Nunez testified that it was against travel policy to advance a daily allocation to a council member who would be attending a conference where meals were to be provided. When Nunez questioned the city manager's secretary, Anna Teresa Lee, about the per diem payments to the council members for meals that were paid for by Fitzgerald, Nunez was told that "it was an unusual circumstance" and that the city manager "was going to allow it." Lee told Nunez that Lee had questioned De Dios, who questioned Blancarte and that Blancarte "was going to allow it." When asked whether any of the city council members ever reimbursed Irwindale for New York trip expenses, Nunez replied, "Not to my knowledge."

Anna Teresa Lee testified that from 2001 until June 2011, she worked as the secretary to the city manager and to the city council. As part of her duties, she prepared reimbursement forms for per diem requests for some members of the city council. Deputy District Attorney Huntsman questioned Lee extensively regarding per diem allocations for bond rating trips to New York City in 2001, 2001, 2003, and 2005. She

testified that she always asked for receipts, "but I didn't always get receipts." The city manager's policy was to provide a per diem reimbursement without requiring receipts. Deputy District Attorney Huntsman asked Lee, "Were you ever aware of a policy that, or opinion of somebody that it was okay for a public official to request to be given public money as a per diem when they had not actually had any expense in terms of meals? In other words, if they'd gone on a trip, somebody else had paid for all the meals, are you ever aware of anybody saying, 'Oh, that's okay. You can still have $75 for that day?'" Lee answered that such was the city manager's policy to have a "standard $75 a day payment." Lee responded to a further question by Deputy District Attorney Huntsman, stating: it was "difficult to recall an exact conversation," but "there may have been a memo that indicated that the policy had been slightly adjusted to provide, and in fact, I seem to recall something about the $75 a day per diem memo, but I didn't see it in your records." Deputy District Attorney Huntsman immediately asked, "Do you remember anything about that memo saying that it was okay to, quote, double dip in order to take the $75 per diem . . . when you weren't actually spending money on food?" Lee responded, "No."

Lee echoed Nunez's testimony that city employees were not allowed to address the city council.

Suzanne Quinn Harrell testified that she is a financial consultant for Irwindale. She testified that, as a consultant, she paid expenses for bond rating trips from 2001 through 2005. For the 2005 New York City bonding trip, Harrell submitted an invoice that listed her fee for services plus "reimbursable expenses." She testified that Blancarte chose the hotels, restaurants and entertainment. Harrell identified a check from the Irwindale Community Redevelopment Agency payable to Harrell and Company in the amount of $62,457.16, signed by De Dios. Harrell testified that she cashed that check.

Roberto Allas, senior investigator in the Major Crimes Organized Crimes section of the office of the district attorney recalled that he interviewed Fitzgerald on several occasions, without specifying dates. Allas testified that Fitzgerald said that the Broadway show tickets were legitimate, because such activities constitute legitimate business

12

expenses and City Attorney David Aleshire had pre-approved them. Fitzgerald later told Allas that he was not sure that Aleshire had pre-approved the activities.

Allas further testified as to conversations he had with Garcia in August 2008. Garcia told him that Garcia gave four to five presentations every day during a bonding trip. Allas testified that Garcia had characterized the "extra-curricular activities" as part of the "cost of doing business." The payments for meals and entertainment were also legitimately part of "doing business." Deputy District Attorney Huntsman asked Allas, "And did you ask [Garcia] about or did he ever say anything about whether or not he was aware that the costs of his meals were going to be reimbursed by public funds?" Allas answered in the affirmative, responding, "He did say that he realized that the public monies would be used to reimburse the financial consultants." Allas did not state when Garcia came to this realization, but Allas later said that Garcia had told Allas that because a new law passed in 2006, Garcia believed that he "was not allowed to be able to take [part in] those sorts of activity on a trip." Garcia also told him that the food in New York City was very expensive and that a hot dog could cost $12. Whether Garcia ever said that at the time he took the lavish junkets he knew the trips were funded from public coffers was not addressed in the district attorney's questioning.

Allas testified that he spoke to Ramirez in August 2008. Deputy District Attorney Huntsman asked whether Allas had queried her about the per diem expenses, saying, "And did you talk to her about the fact that she got her per diem expenses for meals when it appeared from the itinerary that her meals had been paid for by somebody else?" Allas replied, "Initially she believed it was okay to receive those per diems, and by the end of the interview, she was quite sure that, if public monies were used to pay for those meals and those activities [had] exceeded the per diems, that she should have paid for them."

Deputy District Attorney Huntsman then asked Allas, "And at some point did you talk to her at all about whether or not she was aware that public funds were being used to reimburse theses expenses that were being paid for by Fitzgerald?" After reviewing his notes, Allas responded, "Ramirez told me that she was aware that public monies were used to pay the financial consultants for their expenses." She told Allas that she did not

13

think that the expenditure of public money would show in the minutes of the city council meetings.

Allas recounted his conversation with De Dios: De Dios told Allas that after the 2001 bond rating trip to New York City, Blancarte instructed him not to ask Fitzgerald for receipts. De Dios told Allas that Fitzgerald was "reimbursed from city accounts and later on the city would recoup those funds from the bond sales." When Deputy District Attorney Huntsman asked about per diems, Allas replied that De Dios advised Allas that "it was Mr. Blancarte's policy that city council members on these trip[s] or city staffers on these trips would be given their full per diem regardless if the meals were paid for by someone else."

In May 2008, Allas spoke with Breceda, who told Allas that all the activities on the trips were "justified as city-related business." Breceda "claimed that the trips were made public in city council meetings but you would not be able to find details of their activities in the minutes." Deputy District Attorney Huntsman asked, "And at some point during your conversation [with Breceda], did he say anything about whether or not it was appropriate for him to receive per diems when, in fact, somebody else paid for the meals he ate?" Allas responded, "He said that given the fact that their meals were paid for by other people, they should not have received per diems, but if he had paid for [the meals] himself using a credit card, then he should have received a return [*sic*]."

Deputy District Attorney Huntsman asked Allas whether he had spoken to Aleshire, the city attorney of Irwindale. Allas answered in the affirmative. Deputy District Attorney Huntsman queried, "When you did speak to [Aleshire], did he say whether or not he had told city council members that it was just great for them to go to Broadway shows on public money and that it was okay?" Allas replied, "No, he never told me that."

Last to testify was Linda Joy Kimbro, deputy city clerk for Irwindale from 1998 until June 2011. She testified that expenses were presented to the city council through line items and, although warrants could be pulled during a meeting if a council member had a question, it did not happen "very many times, if any at all." Deputy District

14

Attorney Schwartz asked her, "Within the City of Irwindale, [where] would details regarding where the funding for the New York City bond trips [have] originated?" Kimbro responded, "Finance Department."

The office of the district attorney presented evidence[7] to the grand jury that included a list of expenses for the 2001 trip on letterhead of Fitzgerald's company. The page is entitled "Expenses" and it lists "London Towncars, Inc.," at $10,057.60, "John Fitzgerald's Expense Report" at $15,773.13, "Theater/Game Tickets" at $5,760, and "City Officials' Hotel Rooms" at $16,582.90, for a total of $48,173.63. Further, the prosecution adduced a handwritten note, signed by De Dios, stating: "Re Refunding of Irwindale CUPS to generate proceeds for Park Municipal Facilities. To be reimbursed from Refunding CUPs proceeds." In what appears to be the same handwriting, another note, in evidence, states: "Must pay this week, or will require city to declare expenditures to FPPC."

The People proffered an expense voucher, by Garcia, showing that he requested reimbursement of a per diem rate of $75 for a "Finance Trip" to New York City that took place on April 13 to 17 in 2005. The prosecution also provided the grand jury with an expense voucher in which Breceda requested reimbursement of $75 per day for the same trip.

The prosecution further made available a copy of Breceda's expense voucher for a "Taxable Housing Tax Allocation Bond Financing" trip to New York City that took place August 6 to 11, 2005, in which Breceda requested a per diem reimbursement of $75.

The grand jury had evidence before it, to wit: on May 17, 2005, the city council conducted a meeting at which it approved a warrant to Harrell and Company (which had picked up the April 2005 New York City expenses) in the amount of $62,457.16. The page that was presented to the city council shows a line that gives the check number, the

---

[7] In support of the informal opposition to the petition, the People filed one volume of exhibits which includes ten sets of evidence presented to the grand jury as well as the indictment. The People identify most of these exhibits as redacted versions of the exhibits presented to the grand jury, which is, of course, a secret proceeding.

vendor number and name (Harrell & Company), the date ("04/28/2005"), and the amount ($62,457.16). The accounts payable master list shows that the warrant was to reimburse Harrell & Company for a rating trip.[8] There was no testimony before the grand jury as to whether any of the petitioners saw this master list. De Dios was one of the signers of that check, dated April 28, 2005, and payable to Harrell & Company.[9]

Fitzgerald sent information to De Dios about the 2003 and August 2005 trips in handwritten notes via facsimile on July 31, 2007.

In her closing statement, Deputy District Attorney Schwartz stated that the charges against petitioners related to five New York City trips. She focused almost exclusively on the per diem allotments: "Now, Breceda, Ramirez and Garcia were all city council members when they went. Abe De Dios went as the city finance director. *And the reason that Breceda, Ramirez and Garcia are charged is that they double dipped. They submitted per diem expense requests at a time when their expenses were already covered by Suzanne Harrell, the financial advisor on the April 2005 trip, or by Mr. Fitzgerald for the other trips.*" (Italics added.)

"And those expenses . . . not just covered lunch, dinner, and . . . alcoholic beverages, meals at New York's finest restaurants, those expenses were covered to the teeth. Those people were wined and dined as if they were wealthy people, and I have to tell you, that was public money that was being spent on those thousands of dollars of dinners and thousands of dollars of Broadway shows, shows that had no legitimate public purpose for being paid for by the taxpayers of the City of Irwindale.

"And at the same time those expenses were being funneled to the City for payment by Fitzgerald and by Harrell, those city council members were submitting per diem requests for the same lunches and dinners. *And when you look at their expense vouchers, you see that some of them broke down breakfast, lunch, dinner or just lunch and dinner,*

---

[8] In the record, the name of the company appears as both "Harrell & Company" and "Harrell and Company."

[9] There were two other signers of the check.

16

*so they knew what those per diems were for. They were for the costs of their meals, but those were meals they didn't pay for.*" (Italics added.) She added: "The People contend that these funds were embezzled, and they were. *Money was taken from the City for per diem expenses that these council people were not entitled to. The People contend that these embezzlements were not in good faith.* There is just no way that these takings were in good faith." (Italics added.)

Deputy District Attorney Schwartz characterized De Dios as "careful not to double dip," but he "knew that those expenditures were wrong, and he let it happen. He signed off on the checks." She concluded as to De Dios that: "He signed the checks" and "[h]e allowed it to happen. He's an aider and abettor, and *that's why he's charged with the same crimes, because he allowed this criminal conduct to go on when he knew about it, was in a position to stop it.*" (Italics added.)

On December 12, 2011, the grand jury returned a six-count indictment. In count 1, Breceda and De Dios are accused of embezzlement of public funds "[o]n or between June 2, 2001 and the present" in violation of Penal Code sections 504 and 514 with a fraudulent intent to appropriate the public funds contrary to Penal Code section 487, subdivision (a), and within the meaning of Penal Code section 514. In count 2, Breceda, De Dios and Ramirez are accused of embezzlement of public funds "[o]n and between July 27, 2002 and the present" with a fraudulent intent to appropriate the public funds contrary to Penal Code section 487, subdivision (a), and within the meaning of Penal Code section 514. In count 3, Breceda and De Dios are accused of embezzlement of public funds "[o]n and between November 8, 2003 and the present" in violation of Penal Code sections 504 and 514 with a fraudulent intent to appropriate the public funds contrary to Penal Code section 487, subdivision (a), and within the meaning of Penal Code section 514. In count 4, Breceda, Garcia and De Dios are accused of embezzlement of public funds "[o]n and between April 13, 2005 and the present" in violation of Penal Code sections 504 and 514 with a fraudulent intent to appropriate the public funds contrary to Penal Code section 487, subdivision (a), and within the meaning of Penal Code section 514. In count 5, Breceda and De Dios are accused of embezzlement of

17

public funds "[o]n and between August 6, 2005 and the present in violation of Penal Code sections 504 and 514 with a fraudulent intent to appropriate the public funds contrary to Penal Code section 487, subdivision (a), and within the meaning of Penal Code section 514.[10]

Count 6 names Ramirez, only, and accuses her of dissuading a witness from testifying in violation of Penal Code section 136.1, subdivision (a)(1).)

Motion to dismiss indictment

Petitioners moved to dismiss the indictment on various bases, including the failure of the office of the district attorney to present to the grand jury exculpatory evidence, the March 28, 2002 Resolution, No. 2002-17-1808 and the 2002 memorandum. This contention is the sole issue that petitioners raise in their petition.

In opposition to the motion to dismiss, Deputy District Attorney Huntsman stated in his declaration that he did not see the 2002 memorandum in the file. Deputy District Attorney Schwartz stated in her declaration that she did not see the 2002 memorandum and was not aware of it until she saw the motion to dismiss the indictment. Neither declaration mentions the resolution.

During the hearing on the motion, Deputy District Attorney Huntsman argued that the petitioners knew that they were misusing public funds when they went on the New York City trips and that they added to the embezzlement, "just an extra slap in the face, where they get back and they submit that per diem, double dip for a much lesser amount." Steven Levine, counsel for Garcia responded that the prosecution was shifting its theory. He pointed out that the closing argument focused on double dipping and he quoted from Deputy District Attorney Schwartz's closing argument in support. Breceda's counsel, Anthony Falangetti, criticized the prosecution, stating that "they lumped this Broadway show claim with lavish meals. Not only do they lump it in their opening statement for the grand jury, they lumped it in with you."

---

[10] Petitioners are *not* charged with violation of Penal Code section 424, which applies to government officials. (Cf. *People v. Bradley* (2012) 208 Cal.App.4th 64, 68.)

18

Respondent court stated at the hearing:

"One. If the People knew about the exculpatory evidence and the defense did not, then the indictment arguments would be good and the indictment should be set aside.

"Two. If the People knew about the exculpatory evidence and the defense knew about the exculpatory evidence, it is a wash.[11]

"Three. If the People did not know about the exculpatory evidence and the defense knew about the exculpatory evidence, again it would be a wash."

Respondent court commented that the "essence" of the prosecution's theory was double dipping. When the district attorney's office countered that its primary theory was one of embezzlement generally, the trial court walked back its earlier comments, stating "that basically regarding embezzlement, any conduct that can be prosecuted under the embezzlement theory will be allowed in this matter, if this matter goes to trial. And so that's the court's ruling in this matter.

The court's comments did not address whether the failure by the district attorney's office to produce exculpatory materials on the double dipping theory may have unfairly prejudiced petitioners in the grand jury's elemental determination whether probable cause existed for any embezzlement theory. Garcia's counsel Levine asked for clarification, stating that "the People's theory of the case that was presented to the grand jury was this double dipping." Respondent court recognized that the prosecution's "main focus" before the grand jury had not been the lavish nature of the trips, but, "I don't think the People can be foreclosed simply because that wasn't the main focus before."

Respondent court stated that it relied on the affidavits of the two deputy district attorneys that they personally had no knowledge of the 2002 memorandum. It made the factual finding that the two deputy district attorneys knew nothing about the 2002 memorandum. Respondent court impliedly concluded that as a matter of law, the investigator's knowledge of the document, which was referenced by the investigator in

---

[11] While not relevant to this disposition, this statement apparently does not take into account that the defense team did not make a presentation to the jury.

19

his affidavit in support of the 2008 search warrant, could not be imputed to the two attorneys. It made no specific reference to the 2002 resolution or other factual matters.

## DISCUSSION

Petitioners contend that the sole basis for the indictment for embezzlement is the claiming of the $75 daily allotments by Garcia, Breceda and Ramirez and the paying of those claims by De Dios. Petitioners assert that because the prosecution's primary focus in closing argument—and respondent court's in ruling on the motion to dismiss—was the $75 allotment, the failure of the prosecution to provide two significant documents (the 2002 city resolution and the 2002 memorandum by the city manager), substantially prejudiced petitioners.

In the return, the People point out that as demonstrated by its comments regarding additional evidence that the People might introduce at trial, respondent court did not base its denial of the motion to dismiss solely on the double dipping theory. The People assert that respondent court "changed its original position," as shown by respondent court's statement that "'any conduct that can be prosecuted under the embezzlement theory will be allowed in this matter, if this matter goes to trial. And so that's the court's ruling on this matter.'" The People further argue that 2002 memorandum of the city manager was not exculpatory, but, if it was exculpatory, equivalent evidence was presented through testimony of various witnesses.

In the reply to the return, petitioners emphasize that respondent court expressly stated at one point that it was basing its ruling solely on the double dipping theory and that its reference to any other evidence was limited solely to what the prosecution might produce at trial. Thus, petitioners reiterate that, as respondent court's ruling solely concerned the double dipping theory, the two 2002 documents were completely exculpatory, and the failure to provide them was highly prejudicial.

Petitioners are accused of violating Penal Code section 504, which provides: "Every officer of this state, or of any county, city, city and county, or other municipal corporation or subdivision thereof, and every deputy, clerk, or servant of that officer, and every officer, director, trustee, clerk, servant, or agent of any association, society, or

20

corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of that person's trust, any property in his or her possession or under his or her control by virtue of that trust, or secretes it with a fraudulent intent to appropriate it to that use or purpose, is guilty of embezzlement."

Section 514 provides that, if embezzlement is of public funds, the crime constitutes a felony: "Every person guilty of embezzlement is punishable in the manner prescribed for theft of property of the value or kind embezzled; and where the property embezzled is an evidence of debt or right of action, the sum due upon it or secured to be paid by it must be taken as its value; if the embezzlement or defalcation is of the public funds of the United States, or of this state, or of any county or municipality within this state, the offense is a felony, and is punishable by imprisonment in the state prison; and the person so convicted is ineligible thereafter to any office of honor, trust, or profit in this state."

Section 487, subdivision (a) provides that, "[w]hen the money, labor, or real or personal property taken is of a value exceeding nine hundred fifty dollars ($950)," the taking constitutes grand theft.

**I**

The office of the district attorney had the duty to present exculpatory evidence to the grand jury and breached that duty.

Section 939.71 sets forth the parameters of the prosecutor's duty to present exculpatory evidence to the grand jury. Section 939.71 provides:

"(a) If the prosecutor is aware of exculpatory evidence, the prosecutor shall inform the grand jury of its nature and existence. Once the prosecutor has informed the grand jury of exculpatory evidence pursuant to this section, the prosecutor shall inform the grand jury of its duties under Section 939.7. If a failure to comply with the provisions of this section results in substantial prejudice, it shall be grounds for dismissal of the portion of the indictment related to that evidence.

21

"(b) It is the intent of the Legislature by enacting this section to codify the holding in *Johnson v. Superior Court*[ (1975)] 15 Cal. 3d 248, and to affirm the duties of the grand jury pursuant to Section 939.7."

In *Johnson v. Superior Court*, *supra*, 15 Cal.3d 248, the Supreme Court held: "When a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the grand jury of its nature and existence." (*Id.* at p. 251.) The Supreme Court explained: "The grand jury's 'historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor' [citation] is as well-established in California as it is in the federal system. 'If [exculpatory] evidence exists, and [the grand jury] have reason to believe that it is within their reach, they may request it to be produced, and for that purpose may order the district attorney to issue process for the witnesses ([former] § 920, Pen. Code), to the end that the citizen may be protected from the trouble, expense, and disgrace of being arraigned and tried in public on a criminal charge for which there is no sufficient cause. A grand jury should never forget that it sits as the great inquest between the State and the citizen, to make accusations only upon sufficient evidence of guilt, and to protect the citizen against unfounded accusation, whether from the government, from partisan passion, or private malice.' [Citation.] [¶] The protective role traditionally played by the grand jury is reinforced in California by statute." (*Id.* at pp. 253–254.)

The Supreme Court based its decision on the nonadversarial nature of the grand jury, unlike trial proceedings, to conclude: "As has been explained, if the district attorney does not bring exculpatory evidence to the attention of the grand jury, the jury is unlikely to learn of it. We hold, therefore, that when a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the grand jury of its nature and existence, so that the grand jury may exercise its power under the statute to order the evidence produced." (*Johnson v. Superior Court*, *supra*, 15 Cal.3d at p. 255.) The Supreme Court expressly analyzed the case pursuant to statute and stated that it did not need to consider the due process claim. (*Ibid.*)

22

The petitioners contend that respondent court made a legal determination that the lack of personal knowledge of the 2002 documents[12] by the two deputy district attorneys removed the obligation of the prosecution to present these documents to the grand jury. Mentioning only the 2002 memorandum, the People counter in the return that such determination was not the basis for respondent court's ruling, was made after the court issued its ruling, and was not necessary to a decision on the motion to dismiss. Petitioners' opposition to the return, while acknowledging the temporal order of the court's comments, insists that the court simply clarified the basis for its ruling, with the court's comments showing that it had decided that the individual deputies were not responsible for the presence of every document in the prosecution's files.

Although respondent court made the factual finding that the two deputy district attorneys had no personal knowledge of documents claimed exculpatory, this fact does not excuse the prosecution from its obligation to provide exculpatory documents, an obligation that ensures the independent nature of the grand jury.

The parties do not dispute that the office of the district attorney was aware of the resolution and the 2002 memorandum, but that Deputy District Attorneys Huntsman and Schwartz did not personally possess this knowledge. The knowledge, or lack of knowledge, of the two deputies is of no moment. Narrowing the effect of section 939.71 to the individuals who handle the case before the grand jury is contrary to the purpose of the statute as set forth by the Supreme Court. It is the duty of the office of the district attorney to gather all the information made available throughout the office and present that information to the grand jury. The grand jury, not the prosecutor, has the duty to sift through the evidence and weigh it to come to a fully-informed conclusion.

## II

Petitioners were prejudiced by the failure of the office of the district attorney to present exculpatory evidence to the grand jury.

---

[12] It is not clear in the reporter's transcript of the hearing on the motion to dismiss whether respondent court referred to both 2002 documents or to the 2002 memorandum, only.

The purpose of a grand jury is to investigate allegations of crime to determine whether, after an investigation, an indictment should be filed. "After the investigation, the grand jury must 'find an indictment' if 'all the evidence before it, taken together, if unexplained or uncontradicted, would, in its judgment, warrant a conviction by a trial jury.' [Citation.]" (*McGill v. Superior Court* (2011) 195 Cal.App.4th 1454,1469–1470, fn. omitted.)

"In the context of grand jury proceedings, the court must decide whether the record reflects a probability that a properly informed grand jury would not have found probable cause to indict; i.e., whether the grand jury would not have found a strong suspicion of guilt. This analysis requires a consideration of the relative strengths and weaknesses of the evidence supporting the probable cause finding necessary to indict and the undisclosed exculpatory evidence. [Citation.]

"In evaluating prejudice, one relevant consideration is the extent to which the prosecution's disclosure deficiency interfered with the grand jury's independent investigatory function. Because the grand jury is expected to act independently and prevent unwarranted prosecutions and yet must rely on the prosecution to present the evidence without participation by the defense, the prosecution is statutorily required to inform the grand jury of the existence of material exculpatory evidence. If the prosecution fails to comply with its disclosure duty and its failure undermines the grand jury's ability to perform an independent investigation, this may be a significant indication that the disclosure error affected the grand jury's finding. [Citations.]" (*Berardi v. Superior Court* (2007) 149 Cal.App.4th 476, 494.)

Petitioners have carried their burden to demonstrate that they were prejudiced by the failure of the prosecution to present Resolution No. 2002-17-1808 and the 2002 memorandum to the grand jury, because those factors are probative as to whether petitioners believed that they were acting lawfully. For a charge of embezzlement, the taking must be fraudulent: """The essential elements of embezzlement are the fiduciary relation arising where one intrusts property to another, and the fraudulent appropriation of the property by the latter.""" (*People v. Talbot* (1934) 220 Cal. 3, 15.) "'[F]raudulent

24

intent is an essential element of the offense of embezzlement . . . .'" (*Id*. at p. 13.)

The prosecution provided no direct evidence that Breceda, Garcia and Ramirez knew, at the time of the trips, that the trips were paid for out of city funds. The minutes of the council meetings at which the reimbursements to Fitzgerald and Harrell were approved show the reimbursement requests only as unexplained line items, with no indication that the financial advisors were being reimbursed for food, hotel, and entertainment expenses that they had "picked up" in New York City.

The prosecution provided the grand jury a spreadsheet—prepared by Nunez only after the investigation began—which details the New York expenditures on behalf of each official, including Breceda, Garcia, Ramirez, and De Dios, for trips from 2000/2001 through 2005/2006. Unarguably, the spreadsheet shows a shocking amount of money was spent on the trips, but it does not show that Breceda, Garcia or Ramirez knew that the expenses paid by Fitzgerald and Harrell were reimbursed by the City of Irwindale.

While Allas testified that Garcia had come to realize that Fitzgerald and Harrell were not his ultimate benefactors, it would be a stretch—on this record—to infer that Garcia had the realization at the time of the trips. The same is true for Allas's testimony as to his interview with Ramirez. Allas did not testify as to these matters: whether he asked Ramirez if at the time of the trips Ramirez knew that the financial consultants were to be reimbursed with public funds, and when Ramirez first knew about the reimbursements. Allas testified that Breceda believed that the trips were necessary.

In 2001, De Dios was presented with the first invoice from a third-party financial consultant requesting reimbursement for expenses that the third party had paid for the 2001 bonding trip to New York and his notation on the invoice makes clear that he was aware that public funds were used to pay for the trip. The evidence also showed that he signed at least one reimbursement check to a third-party financial advisor. The prosecution also provided evidence that De Dios was not given details of the 2003 and August 2005 trips until Fitzgerald forwarded handwritten notations to him in 2007. While the prosecutors did not point to evidence that De Dios engaged in double dipping, and went so far as to acknowledge that De Dios did not engage in double dipping, it

25

fortified its case against all four petitioners by arguing that De Dios willfully facilitated this greedy behavior.

Deputy District Attorney Huntsman opened the proceedings by telling the grand jury about the extreme excesses of the trips and how "they put in for $75 a day, and this is at the same time you have evidence that they didn't spend a dime." Throughout the grand jury presentation, the prosecutors consistently hammered at the $75 allotment issue, eliciting testimony to discredit petitioners' honesty. This double dipping theory was demonstrably the heart of the prosecution's case. Griego testified that he did not see any writings that authorized a set rate for daily expenses and characterized the allotments as stealing. Nunez testified that it was against city travel policy to reimburse traveling officials for meals for which they did not personally pay, but that the city manager had allowed it. When Lee referred to a "$75 a day per diem memo," Deputy District Attorney Huntsman immediately asked, "Do you remember anything about that memo saying that it was okay to, quote, double dip in order to take the $75 per diem . . . when you weren't actually spending money on food?" Lee responded, "No."

After Garcia testified that he believed that the third-party financial consultants paid for the New York City trips, Deputy District Attorney Schwartz asked Garcia, "Did you think it was right to put in for per diem expenses for meals on days when your meals were paid for by someone else?" Garcia responded, "This document was prepared by somebody else. This is one of the first times I've seen it. . . . When they take us to these places, if I don't like something, later on in the evening I will go get a bite to eat, a hot dog, a pizza. That's what New York is famous for."

The prosecution's focus on the per diem allotment ostensibly established probable cause that Breceda, Garcia and Ramirez ignored city policy and greedily double dipped to benefit themselves. De Dios was part of this scheme, disbursing the $75 allotment and thus feeding and encouraging his colleagues' avaricious natures.

In turn, if the lavishness of the junkets was in fact a presented theory of embezzlement, as the People now claim—a contention that is in no way manifest, in the grand jury transcript given the prosecutors' laser-like focus on double dipping—the grand

26

jurors would be expected rationally to infer that if petitioners were dishonest about their entitlement to the $75 allotment, then the petitioners must also have had fraudulent intent as to the lavish expenditures. Thus, if the prosecutors did present a lavish expenditure embezzlement theory, their reliance on the ostensible dishonesty of double dipping was effectively a substitution of the perceived fraudulent intent element of double dipping for the missing fraudulent intent element of a lavish-expenditure embezzlement theory. Where the prosecution had in its possession but failed to produce two documents that could have proven to the grand jury that petitioners acted in accord with city policy when they accepted (or disbursed) a $75 allotment for each day of travel, this de facto transference of fraudulent intent evidence was unfairly prejudicial to petitioners.

The prosecution had in its possession, but did not use, the city manager's July 2002 memorandum expressly providing that the $75 per diem is an allotment to be paid even in the absence of an actual meal expense.[13]

If the grand jurors had been presented with the 2002 resolution and the 2002 memorandum, the grand jurors would have had the opportunity to consider whether those documents showed that petitioners had no fraudulent intent as to the $75 allotment. Further, if petitioners were deemed to have acted lawfully with regard to the Irwindale's travel reimbursement policy, then those acts of so-called "double dipping" could not be the inferential underpinning of a probable cause finding of fraudulent intent to misappropriate, as to the lavish benefits.[14]

### III

Because petitioners have suffered substantial prejudice from this omission, the indictment must be vacated.

---

[13] The parties did not, and we do not, address the issue of the authority of the city to issue the resolution and the issue of the legal import of both the resolution and the notation on it.

[14] We need not reach the issue as to whether the withholding of information from a grand jury constitutes a *Brady* violation (*Brady v. Maryland* (1963) 373 U.S. 83, 87 [83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215]).

"When applying this test [of substantial prejudice], the court should evaluate the record as a whole, taking into consideration such factors as the extent to which the lack of disclosure interfered with the grand jury's independence, and the strength and nature of the undisclosed exculpatory evidence as compared to the evidence supporting the grand jury's finding of probable cause to indict. If the accused shows it is reasonably probable that the grand jury would not have found probable cause to indict absent the disclosure error, the accused is entitled to dismissal of the indictment at the pretrial stage." (*Berardi v. Superior Court*, *supra*, 149 Cal.App.4th at p. 481.)

"[N]ot all cases involving some deficiency in disclosure and interference with the grand jury's independence will support dismissal. Rather, the court must evaluate the record as a whole, taking into consideration all relevant factors. These factors include the strength and nature of both the undisclosed exculpatory evidence and the probable cause evidence that was presented. Regarding the disclosure errors, pertinent inquiries include the extent of the impact on the grand jury's independence and the extent to which the material could 'explain away the charge.' If the record shows that sufficient evidence of probable cause remains even after considering the undisclosed evidence, this does not end the analysis. The court must still determine if there is ""'such an equal balance of reasonable probabilities as to leave the court in serious doubt'"" as to whether a properly informed jury would have declined to find probable cause to indict had it known of the omitted evidence. [Citation.] If so, the defendant has established the requisite substantial prejudice and is entitled to dismissal of the indictment." (*Berardi v. Superior Court*, *supra*, 149 Cal.App.4th at p. 495, fn. omitted.)

"Typically, appellate courts evaluate issues pertaining to fundamental fairness by deferring to the trial court's factual resolutions and then independently reviewing whether the rule of law as applied to the established facts was violated. [Citations.] Additionally, irregularities at grand jury proceedings should be closely scrutinized because protection of the defendant's rights is entirely under the control of the prosecution without participation by the defense. Accordingly, [the appellate court] will independently review the undisputed facts to determine whether [the petitioners'] rights were

substantially prejudiced." (*Berardi v. Superior Court*, *supra*, 149 Cal.App.4th at pp. 495–496.)

"[T]he fact that the record can support a finding of probable cause does not mean there is no reasonable probability the jury would have rejected such a finding. The bolstering of the prosecution's evidence at the expense of the available defense evidence shows a reasonable probability that the jury would not have found probable cause had it been properly informed." (*Berardi v. Superior Court*, *supra*, 149 Cal.App.4th at p. 498.)

Even if, as the People argued at the hearing on the motion to dismiss, the evidence of lavish trips itself was a basis for the embezzlement charges, we conclude that the People's failure to provide exculpatory evidence prevented the jury from exercising its independent evaluation of whether petitioners had the requisite fraudulent intent. In withholding the exculpatory documents from the grand jury, the prosecution prevented the grand jury from exercising its independent judgment in assessing the double-dipping theory, the lynchpin of the prosecution's fraudulent-intent evidence.

The 2002 resolution and 2002 memo arguably would have shown that there was no deceit, whatsoever; thus, in the end, the grand jurors would have had almost no evidence before them upon which to decide that petitioners had acted with fraudulent intent to misappropriate public funds on either a double dipping or lavish expenditure theory. While we agree that the petitioners' profligate use of their positions to obtain excessive food and entertainment benefits from the financial consultants is an abuse of the public trust and perhaps violative of certain criminal laws, that conduct alone would not constitute embezzlement. While greed and fraudulent intent may be siblings, they certainly are not identical twins. Proof of one is not proof of the other. Therefore, we conclude that petitioners were substantially prejudiced by the failure of the prosecution to provide these two significant documents that arguably demonstrate that the petitioners acted according to city policy.

**DISPOSITION**

The petition is granted. Let a peremptory writ of prohibition issue, directing the respondent court to refrain from any further proceedings against petitioners Mark Breceda, Abe De Dios, Manuel Garcia and Rosemary Ramirez on counts 1, 2, 3, 4 and 5 of the indictment.

CERTIFIED FOR PUBLICATION.


                                              JOHNSON, J.


We concur:


        MALLANO, P. J.


        CHANEY, J.


30